*Eastern Dist.*
*May, 1840.*

UNION BANK
*vs.*
GRIMSHAW.

---

## UNION BANK *vs.* GRIMSHAW.

APPEAL FROM THE COURT OF THE FIRST JUDICIAL DISTRICT, JUDGE BUCHANAN PRESIDING.

The law is well settled, that notice of the non-payment or dishonor of a bill given to the drawer by the acceptor, or any of the parties to it, is sufficient, and enures to the benefit of all the other parties.

Letters written on the day the bills become due, by the acceptor, and addressed to the drawer, that they must go back protested, is sufficient notice to him.

So, if a note or bill is presented in the forenoon of the day it becomes due, and payment is refused, notice given in the afternoon is good.

Part payment, or a promise to pay a bill or note, furnish grounds to infer presentment, and notice of the dishonor or non-payment.

So, where the defendant, as drawer of bills, after being advised by letter from the acceptor of their dishonor, acknowledged the debt, and

promised to pay the holder of the bills by instalments, on short time it must be viewed either as an admission that the notices were good or a waiver of them.

This is an action on two bills of exchange drawn by the defendant, the 18th February, 1837, on N. Berthoud, of New-York, payable sixty days after sight, to the order of the cashier of the Union Bank. They were accepted, and protested for non-payment at maturity; one on the 3d, and the other on the 6th of May following.

The defendant admitted his signature to the bills, but denied all the other allegations in the petition.

Interrogatories were propounded, inquiring of him if he had not received notice of the dishonor of the bills, by mail, and from the notary who protested them, or in some other way, and at what time, and how he received such notice. Also, did he not receive notice from the acceptor that the bills were not paid, and to annex the notices to his answer.

The answer negatived all the interrogatories except the last, in which the defendant states, " that he received no other advice of the non-payment of said bills from the acceptor, than is contained in his letters to me of the 3d and 6th of May last, and which are annexed."

In the first letter, dated New-York, 3d May, 1837, Berthoud states: "annexed, you have a duplicate of *what I wrote you this morning*, per the common mail. Matters are most gloomy in Wall-street, to-day," &c., " and I fear the banks are not much better off. I made another attempt to discount paper *to pay your draft of twenty-five thousand dollars, due to-day, but could not succeed; it will, therefore, be protested.*"

On the same day he writes another letter, in which he says: " In making arrangements for the bills on me which must inevitably go back, you must get as long time as possible, to get time to collect from the parties here. Under existing circumstances, I hope the banks will be as lenient with you, as they may be with the most favored parties," &c. &c.

On the 6th of May, Mr. Berthoud states: "Your draft for twenty thousand dollars, *due this day, must go back.* It now looks as if not another note I hold, payable this month, would be paid." It was in proof that the bills came back protested, in due course of mail, with notices of protest enclosed to the plaintiffs; that they were handed over by the officers of the bank to the defendant's clerk. This clerk, however, states they were not given to him until about the 25th June, afterwards. On the 20th May, the defendant addressed a letter to the bank, stating the situation of his affairs, and that he had come to the conclusion of temporarily suspending payment of his obligations, and asking indulgence, with the privilege of renewing the bills on time. He also says: "he received notice this day of the protest and non-payment of one of his drafts, passed through this bank on Mr. Berthoud, of New-York, which will probably be followed by others."

On the 5th February, 1838, the defendant again addressed the bank on the subject of renewing these bills, and says: "I would gladly give further security to the bank, were it in my power, and had I any portion of the assets belonging to these bills, in my own possession," &c. "From the representations I receive from that gentleman, (Berthoud), I have the utmost confidence of the proposed renewals being at least duly met.

The negotiations failed of success, and on the 22d February, 1838, this suit was instituted.'

There was judgment for the plaintiffs, and the defendant appealed.

*Eustis,* for the plaintiffs, contended, that notice of the dishonor of a bill may come from any person who is a party to it; that if the drawer or endorser receive notice from any person who is a party to the bill, he is directly liable to the subsequent endorser, from whom he had no notice of the dishonor; and in an action by the endorsee against the *drawer,* it is expressly laid down, that it is sufficient if the drawer had notice of the dishonor, *even from the acceptor.* 3 *Kent's Com.* 108; *Chitty on Bills,* 538. 2 *Campbell,* 373. 1 *Starkie,* 34; 5 *Cowen,* 309.

We now come to the facts of the case before us:

2. In considering the letters of Grimshaw simply as matters of evidence, we find none of the circumstances attending them which would render them inadmissible, or without consequence. At the several times they were written, he was not even menaced with a suit; they were not written to buy his peace, nor under any ignorance of the facts; for, he says in his answers to interrogatories, that he received no other notices than those from Berthoud. In this, he is mistaken; but this disclosure shows that his attention must have been directed to these letters: *his* letters show the same fact.

In this view of the subject, we must look for the rules of evidence in our own jurisprudence, which, however, coincides with that of England, and the other states, in this point.

Mr. Starkie, in his treatise on evidence, *p. 32, and seq.*, treats of the subject of concessions or admissions, and states the law at length. He makes the very obvious distinction between the *admissions* or *conduct*, upon which a party has induced others to act, or by which he has acquired some advantage to himself and others, of a less conclusive character. He repeats the well known doctrine, that an admission of a fact may be presumed, not only from declarations, but from silence and the acquiescence of the party, as when the existence of a debt or right is asserted in his presence, and he has not contradicted it. *Page 38, id.*, Starkie states that a *conditional admission*, where a condition has not been performed, is not admissible in evidence.

In this case the objection cannot be made, for the letters *are in evidence without objection.* From the examples given by Starkie, it will be seen that the rule he has stated would not include the letters of Grimshaw, or reach their effect. It may be correct as a general rule, but the exceptions to it must be very numerous, e. g., where the condition itself necessarily presupposes the existence of the obligation. In such a case, there is every reason for the *admission* of the evidence.

Besides, is not a *conditional admission* or *concession*, as a matter of evidence, *an absurdity in terms ;* a promise may be conditional, or a contract may be conditional, but how can a matter of evidence be conditional ? It proves a fact, or not. It cannot be said that it *shall not prove* a fact, because it is conditional ; for the condition may prove the fact. The only objection to admissions, except to those made in duress, or for buying peace, is to their effect. The undersigned cannot refrain from giving the opinion of Pothier on this subject ; the highest authority on matters of obligation in the palace, in this court, or in Westminster Hall :

"The confessions which we here speak of, are those which the debtor makes in conversation, or by letter, or which incidentally occur in some act not passed expressly for that purpose. Dumoulin distinguishes those confessions which my debtor makes to myself, from those made to a third person, not in my presence. When it is to myself that the debtor has confessed the debt, his confession is a complete proof of the debt; but if it were made in a *vague manner*, and without expressing the cause it forms, according to this author, no more than an imperfect proof which requires to be confirmed by the suppletory oath, which the judge ought to administer to me." *Pothier on Obligations, No.* 801.

3. It is clear, though Pothier does not recognize the conditional confession, yet in his opinion, admissions vague, and without expressing the cause, are admissible ; and though they form but an imperfect proof, still, with other evidence, may be taken to establish the existence of the obligation.

In 13 *East*, 213, *Brett*, assignee of *Harrison* vs. *Levet*, a question arose as to the admissibility of the admission of a party to a note after bankruptcy, and the Court of King's Bench held, that the want of notice to a *drawer* may be supplied by evidence of his acknowledgment to the holder, after bankruptcy, when asked if the bill would be paid, that it would not.

It is observed, that in all the various cases which have been collated with so much care by compilers of the law of

EASTERN DIST.
May, 1840.

UNION BANK
vs.
GRIMSHAW.

bills of exchange, it does not appear that there is any objection to the admissibility of confessions or conversations of parties, except in case of the operation of some motive on the part, which renders the admission not probable. But, is there any *condition* in the letters of Grimshaw? There is a term of payment, but not a condition. They are two. things very distinct; the former necessarily presupposing a debt, and the latter not.

A term differs from a condition, inasmuch as a condition suspends *the engagement formed by the agreement;* whereas a term does not suspend the engagement, but merely postpones the execution of it." *Pothier on Obligations,* 230.

The existence of the same distinction in England, is recognized by Mr. Evans, in his notes to Pothier.

4. The propositions of Grimshaw in his letters were not conditional, so as to diminish their force as admissions; and were they not acted upon by the plaintiffs? Did he not get nine months *absolute delay?* a greater or more advantageous indulgence than he asked, in consequence of his coming forward and acknowledging his indebtedness without qualification, and appealing to the liberality of the plaintiffs, under the most solemn assurances of payment.

*Bailey, p.* 498, and notes, states the rule on this subject to be, that a part payment, without any objection being made for want of notice, furnish grounds from which a jury may infer presentment, notice and protest: that an agreement with a prior endorser to pay the bill by *instalments,* is *evidence* in favor of a subsequent endorsee; that the party agreeing to pay the instalments, had received due notice of the dishonor.

Chief Justice Abbot, in deciding the case which settled the doctrine, said: "Had the defendant been discharged by want of notice, he would have insisted on his discharge; he would not have agreed to pay the bill."

*Wood* vs. *Brown, Bailey,* 497; 1 *Starkie,* 217, where the defendant said in a letter that he was an accommodation drawer, and that the bill would be paid before the following term, Lord Ellenborough held that this made proof of the

notice of the dishonor unnecessary. If there has been a subsequent application for indulgence, the only question is, whether it has been made under a mistake of fact; and this must be shown. This is a matter for the jury to consider. *Bailey*, 498, *note* 29.

5. It remains to show that the letters of the defendant amount to a waiver of notice, even supposing none to have been given. There is a difference between the waiver of notice by the drawer and by the endorser: by the former it may be implied; by the latter there must, it seems, be an express promise, or what is tantamount to it. "It has been considered, that admitting that a drawer may by circumstances *impliedly* waive his right of defence founded on the laches of the holder, yet an endorser can only do so by an *express* waiver; there being a material distinction, in this respect, between the situation of a drawer and endorser." *Chitty*, 540. A recital in an agreement between the drawer and the first endorsee, recognizing the liability of the drawer to pay, may be given in evidence against the *drawer*, at the suit of a *subsequent* endorsee. *Idem.*, 538. A case exists, in which an *endorser*, after a promise to pay the debt by instalments, was permitted to take advantage of his want of notice. *Idem.*, 539. But in this case the judge considered that his offer was made under ignorance of the circumstances, and was not binding. *Goodale* vs. *Dolley*, 1 *Term Reports*, 712. In this case it was not contended or considered that the promise was not express, or that it was conditional; but that the endorser had been discharged by the laches of the holder, and made his offer in ignorance of the facts.

Phillips, in his *Treatise on Evidence, vol. II.*, 31, *edition of* 1839, says: "In general, if the *drawer of a bill deal with it* after it is dishonored, with a knowledge of the circumstances, it is sufficient to charge him." It would not be sufficient to charge the endorser. 2 *Starkie on Evidence*, 273; *Notes*, to the same effect.

Griffin vs. Goff is the first case cited by defendant's counsel on the subject of waiver. This was against *an endorser*, and contains nothing which we have any interest in contesting.

The answer that *he knew of no defence,* amounts to nothing, but to establish the ignorance of the matter by the endorser. *Hiller* vs. *Hickley,* a suit against *an endorser.* The promise here was too vague. Van Ness, J., says: "The defendant only said to a third person, when talking generally of all the bills, (that on Baltimore as well as on Charleston,) *that he would take up the bills or see them paid.* Whether he used one phrase or the other is left in doubt, and if the first phrase was used, it was altogether uncertain whether he meant to be understood that he would resist or pay the bills :" *Hopley* vs. *Dufresne,* a stronge case in our favor. For as to Grimshaw's being fully apprized of all the facts of his case, when he wrote the letters of May 20th, 1838, and February 8th, 1839, there can be no doubt. This case is conclusive. The plaintiff had been non-suited, and "it did not *expressly appear that when the defendant applied for indulgence, he was apprised of the objection to the presentation."* The court stopped the argument, and set aside the non-suit, on the ground that it should have been left to the jury to say whether, under the circumstances of the case, the defendant knew, at the time of the application for indulgence, that there had been no due presentation. This case was also against an endorser. *Cummings* vs. *French,* 2 *Campbell,* 106, *at. nisi prius,* a promise made under an arrest, when asked what he, the defendant, *had to propose for a settlement ;* held to be neither an acknowledgment nor a waiver, so as to dispense with proof of notice. No importance appears to have been attached to the promise having been made to pay at a future time. *Agan* vs. *M'Manus,* suit against an endorser, 1814.

The offer was to take up this note and give his own, "payable in one year." This was held not to be binding on the defendant. This was a conditional offer for a compromise and nothing else. "Give me the note on which I am endorser," says the defendant, "which is now due. I will take my recourse on the parties to it, and I will give you my note, payable in twelve months, for it :" a proposition for the purchase of the note, by which, if the drawer was good, he would have had the use of the amount for one year, without

interest. The condition in this case was independent of, and did not presuppose the existence of the original debt. The distinction between this case and the present is too obvious to require illustration. One was an offer to compromise, which did not necessarily imply the existence of an original obligation; the other was a *prayer for indulgence,* and an offer of security for an acknowledged debt. But there is a matter which puts the application of this case out of the question. Every state, that is, all the old commercial states, have their particular usages about promissory notes. This action was on a promissory note, and the question was whether this proposition was binding as an *assumpsit* on the defendant. The ground of *waiver* was inapplicable to the case. Chief Justice Thompson says, in giving the opinion of the court: "The doctrine applicable to waiver of *notice of the dishonor of bills* of exchange, does not *apply to promissory notes.*" Crain vs. Colwell, 1811. Suit on a promissory note against *an endorser,* contains nothing which we have any interest in contesting. Note B. to page 300, 8 *Johnson,* contains nothing which has not been already examined.

Trimble vs. Thorn, 1819, suit on a promissory note *against an endorser.'* The question here was, whether there was an *assumpsit* on the part of the defendant. We have seen, in the case of Agan vs. M'Manus, that in New-York the doctrine of waiver of the want of notice did not apply to promissory notes. If this case applied to the present, it would not in any manner affect the decision; for it is idle to contend that Grimshaw was ignorant of any fact in relation to the case.

*Anthon's Digest,* p. 68, *Miller* vs. *Hickley,* and notes. Anthon's Digest of *nisi prius* cases, is a work of no authority, and, from the time of its publication, can contain nothing which has not been discussed in other works on the same subject. *Miller* vs. *Hickley,* has been examined. The notes contain nothing which is not found elsewhere.

12 *Wheaton's Reports,* 183, *Thornton* vs. *Wynn,* 1827. This is a leading case, and was one on which, after mature deliberation, the case of *Williams* vs. *Robinson,* in 13th *Louisiana Reports,* was decided. This case was brought up from the

District of Columbia. The knowledge of the *laches* formed an indispensable part of the plaintiff's case. The court held that, *from the admission* of the defendant, a regular demand could not be inferred, *but that due notice was not given he could not fail to know.* This might be inferred from his admissions. In our case, there is no question about the demand, and there can be, according to the rules laid down in this, none as to the notice.

This case contains one of the best expositions of the law concerning waiver of notice. The action was against an endorser.

2. *Campbell's Nisi Prius Reports,* (no reference to page.) There is nothing in this volume which has not been repeated in the different treatises on bills of exchange. It is advisable to bear in mind the year in which these cases were reported, and those which have since been confirmed, acted upon or overruled. *Ticknor* vs. *Roberts,* 11 *Louisiana Reports, p.* 17; *Harris* vs. *Allnut, & Co.,* 12 *idem., p.* 465; *Bank of United States* vs. *Ellis,* 13 *idem.,* 369.

In the first case, the promise was made by an *endorser* in error, in ignorance that no demand had been made on the drawer. In the second, it is assumed that the *endorsees* were exonerated by ·the *laches* of the holder. A knowledge of these rights was required to be necessary, before they could be *supposed* to renew their obligation; at any rate it must be shown that they were not ignorant of their rights, or they will not be bound.

This opinion, delivered by Judge Carleton, is based on the authority of 3 *Kent's Commentaries, p.* 113; *Chitty on Bills,* 308; and, it is to be presumed, does not mean to go beyond them. We may as well give the authority from Kent: "If due notice of non-acceptance or non-payment, or a demand on the maker be not made, yet a subsequent promise to pay, by the party entitled to notice, will amount to a waiver of a want of demand or notice, provided the promise was made clearly and unequivocally, and with a full knowledge of the fact of a want of due diligence on the part of the holder. The weight of authority is, that this knowledge may be

inferred as a fact, from the promise under the attending cir-
cumstances, without requiring clear and affirmative proof of
the knowledge." This is believed to be the most complete
and sound rule of the law of waiver of notice as it now
stands and was adopted, after a diligent review of all the
cases decided by the Supreme Court, in the case of *Williams*
vs. *Robinson*, 13 *Louisiana Reports*, 420.

Here end the cases cited by the defendant's counsel; and
if there is any one of them which affects in any manner the
right of the plaintiffs to recover, except so far as it may fortify
it, the inquiry on the part of the undersigned has been,
indeed, fruitless.

He will conclude this reply, which has been continued to
this length only by his respect for every thing which ema-
nates from his learned brother, by briefly giving his view of
this last branch of the case under consideration, the law of
waiver. It is believed that there is no better statement of
it than the very case cited, of *Thornton* vs. *Wynn*, and the
rule of Chancellor Kent adopted by this court.

6. There are numerous cases which have, as it were, form-
ed the jurisprudence on this subject. The case of Wood vs.
Brown, 1 *Starkie*, 217, decided by Lord Ellenborough, is very
strong: it has already been noticed. The *drawer* said that
he was an accommodation drawer, and the bill would be paid
*before the next term*, meaning of the court. The chief justice
said: "the defendant does not rely on the want of notice, but
undertakes that the bill will be paid before the next term,
either by himself or the acceptor. I think the evidence suffi-
cient." In this case there was no proof of notice of dishonor,
&c., and the plaintiff only gave in evidence the letter of the
defendant. There was a verdict for the plaintiff.

Of the effect of an agreement to pay by instalments, see
*Bailey on Bills*, 498, *Note 28*, case of *Gunson vs. Metz; 1
Barnwell* vs. *Creswall*, 193. Here was a promise to pay by
instalments, not to the holder, but to a prior endorsee: this
dispensed with any proof of dishonor of the bill, and was
held to be an acknowledgment of the debt; no one thought

EASTERN DIST. it a conditional one.    It establishes the fact that a term is not
*May,* 1840.   a condition in the English law.

UNION BANK        Hopley vs. Dufresne is a strong case also in our favor; it
*vs.*       has been cited by the counsel for the defendant.    This is the
GRIMSHAW.    case in which an application for indulgence was discussed.

It is well to remark that in the last edition of Bailey on
Bills, all that is within brackets is not from the author, but
added by the American annotators.    From page 296 to 302
is from the annotators, and merely gives American cases.

See *Chitty on Bills,* last edition, 534, 535 and 536, also
503; *Margeson* vs. *Goble,* 2 *Chitty,* 364; *Hopkins* vs. *Liswell,*
12 *Massachusetts Reports,* 53.

7.  The court has the law before them.    It has grown up in
modern times on this subject, in furtherance of the principle
on which the commercial law is founded, that a man's word
is his bond.    Lord Mansfield is reported to have said, that
"in commercial cases among merchants, the want of consi-
deration is not an objection."    3 *Burrows,* 1669.

"Where a man is under a moral obligation, which no court
of law or equity can enforce, and *promises,* the honesty and
rectitude of the thing is a consideration; and as the promise
is only to do what an honest man ought to do, the ties of
conscience upon an upright man are a sufficient considera-
tion."    *Per Lord Mansfield, Cowper,* 290; 2 *Blackstone's
Commentaries,* 445.

This is the foundation of the law of waiver; the object of
the notice is to enable the party to obtain security, and save
himself from injury.    If this object be effected; if he has
not sustained loss from any laches of the holder, the highest
moral obligation exists on the party to return the money
received by him; and any acknowledgment of this obligation
will authorize a court to enforce it against him.    Such is the
*Law Merchant,* which is, in this age, not a mere collection
of arbitrary and technical rules, but the law of right and
reason.

*L. Peirce,* for the defendant and appellant, urged that
there was no notice of protest received from the notary, and

none from the bank until the 20th of June, nearly two months after the dishonor of the bills; but the notices of protest of the bills now sued on, were received by the cashier of the bank in due course of mail. The drawer of the bills not receiving notice from the notary who protested, nor the holders or their agent, must be discharged.

2. The letters of Berthoud to the defendant, are relied on as notice. Is it the fact? The first letter is written on the morning of the 3d of May, to go by the common mail, the day the first bill was payable, in which he says: "These bills must inevitably go back protested." This cannot operate as notice for the one due on the 6th of May, as it could not be construed as notice of that which had not happened; nor is it notice of the one due on the third, for he had all day to pay it in, and until the notices were sent off next morning. The drawer could not act upon the notice; he must wait until the event takes place, before he could go against the acceptor; and he could not show that the bill was protested, if he wished to attach or hold to bail.

It appears the acceptor did attempt (as appears by his second letter of the same day) to raise funds by discounting paper, but could not succeed; so that he had a chance, and as long as the day and night lasted, he might still save himself; *for he had assets,* but the difficulty was to realize them. A fear or anticipation of protest from the acceptor, cannot amount to a notice. In all countries, a premature protest or notice is invalid. *Chitty,* 507; 1 *Pardessus,* 452.

3. In the second letter of the 3d of May, the writer does not say that payment has yet been demanded and refused; he evidently speaks, as in the first letter, *prospectively.* Is this notice of demand and refusal to pay the bill of the 3d of May? Certainly not. The court cannot surely maintain the plaintiffs' case upon these anticipations of the acceptor. *Chitty on Bills,* 527.

4. But the question here is, who is to give notice? If the acceptor had given notice, *after* he had been put in default, and *within* the time, and not *before,* it would not have sufficed; it must come from the holder. 1 *Term Reports,* 167; 7 *Vesey,*

597; 1 *Espinasse*, 333; *Kyd*, 925; *Bailey on Bills*, 310; 3 *Campbell*, 107.

A valid protest for non-payment can only be made by a lawful holder, entitled to demand and receive payment. *Chitty*, 526. However, according to the more recent decisions, it is not absolutely necessary that notice should come from the person who holds the bill, when it has been dishonored; and it suffices if it be given after the bill was dishonored by any person *who is a party to the bill*, who would, on the same being returned to him, and after paying it, be *entitled to require* reimbursement. *Chitty*, 527; 2 *Campbell*, 177. There is a case in 4 *Campbell*, 87, which seems to be against the elementary principle above laid down, where the acceptor wrote to the drawer that he had not been able to pay the bill, (not that it would not be paid,) and that it was then in the hands of the plaintiff. Bailey on Bills, 5th edition, explains this case, that it might have been, "that the acceptor wrote for the plaintiff, and as his agent." See 14 *Massachusetts Reports*, 116.

5. The defendant is not liable for the bill of the 6th of May. All he says is, "your draft due to-day must go back." Is this a notice of presentment and refusal to pay? The bill had not been yet presented, and there is no evidence of the notice after protest or presentment. Shall an anticipation of inability to pay amount to notice that the event has occurred?

6. The plaintiffs next seek to make the defendant liable by his propositions and admissions to the bank, and which were made without any proof that he knew of the irregularities of protest and notice, and which were never accepted. There was no waiver of regular protest and due notice in these propositions. See the cases of Griffin vs. Goff, 12 *Johnson*, 428, and *Miller* vs. *Hinkley*, 5 *Johnson*, 379, on this branch of the case; also, 15 *East*, 27; 2 *Campbell*, 106; 11 *Johnson*, 180.

7. The promise to pay must be positive, not qualified or conditional, and rejected by the holder, or it is no waiver of notice, or irregularity of protest. 8 *Johnson*, 299, and note B, 300; see also 16 *Johnson*, 154. The promise to pay must

be unconditional. 12 *Wheaton*, 183; 2 *Washington C. C. Reports*, 514; 2 *Campbell, N. P. Reports*.

8. The defendant never made an absolute promise; he only proposed terms, which were not accepted; consequently he has not waived his right of proof of due notice of the dishonor of the bill. If he was ignorant of his rights, and that there was no demand of the acceptor and legal notice of protest, he is not bound by any admissions or propositions he may have subsequently made. They were made in error, and cannot deprive him of his legal rights. The following cases are relied on, in support of this position : 11 *Louisiana Reports*, 17; 12 *idem.*, 465; 13 *idem.*, 369.

9. To conclude, notice by any party to a bill, of the non-payment, is not sufficient, when that party has no interest in such notice, and can have no right of action on the bill. 3 *Wendell*, 179; see also *Chitty*, 229; *Bailey*, 161; 2 *Campbell*, 273.

10. Is the offer to pay a debt in notes to be considered as cash; and the defendant's endorsed notes for the balance, an absolute promise to pay? The offer to pay was conditional. The proposition was to take certain bills receivable of the defendant, as cash. This the bank refused. The balance was to be paid at certain terms, by defendant's own notes, endorsed. This was refused. See 8 and 11 *Johnson*, 299 and 180, already cited, on this subject.

*Morphy, J.*, delivered the opinion of the court.

The defendant is sued on two bills of exchange, drawn in favor of the plaintiff, on N. Berthoud, of New-York, accepted by the latter, but protested for want of payment, at maturity. The defence set up is, that due notice has not been given to the drawer. Plaintiffs obtained a judgment, from which this appeal has been taken.

To establish the fact of notice, to the defendant, interrogaries on facts and articles were put to him. He stated that he had received no notice of the dishonor of his drafts, except that contained in two letters received from the acceptor, Berthoud,

which he annexed to his answers.  These letters are dated on the 3d and 6th of May, 1837, at which periods the drafts respectively fall due.  Berthoud writes in substance, that he could not pay the bills, and that they must inevitably go back protested.

This notice is objected to on two grounds, to wit:

1. That it should have come from the holder.

2. That it was premature.

In our examination of this case, we have been materially assisted by the able and elaborate briefs handed to us by the counsel on both sides.

I. In support of his first objection, the counsel for defendant has relied on several cases to be found in the English books ; we have examined them, and find that the point before us was directly made only in two of the cases cited ; and it was held in them that notice should come from the holder.   1 *Term Reports*, 167, *Tindal* vs. *Brown; ex parte Barclay*, 7 *Vesey*, 597.   But this doctrine was overruled by Lord Kenyon, in Shaw vs. Craft, ( *Chitty on Bills*, 528.)  It was proved that a message was left at the house of the drawer by the *acceptor*, stating that the bill had been dishonored.   Lord Kenyon said : "that it made no difference *who apprised the drawer, since the object of the notice was that the drawer might have his recourse against the acceptor.*   We have been referred also to the case of Stanton vs. Blossom, to be found in 14th Massachusetts Reports, 116.   It determines only that a drawer who has not accepted is not a party to a bill, and that notice from him is in no degree better than notice from any other stranger; and that notice must come from the holder or some one authorized by him or from one liable as endorser.   But in this case the drawer had become a party to the bills by his acceptance, and was primarily bound for their payment.   The case of Rosher vs. Kiesan, in 4th Campbell, has much analogy to the present.   It was proved that on the day the bill became due, the *acceptor* wrote to the defendant that he had not been able to pay the bill, and that it was in the hands of the plaintiff. Lord Ellenborough held this to be sufficient notice.   It is difficult to perceive why it should not be so considered ;

notice to the drawer by any party implies that the holder looks to him and secures to him all the benefit he could derive from a direct notice from the holder himself; any agent having possession of the bill may give the notice, and it need not state at whose request it was given, nor who was the owner of the bill.

From a careful review of all the authorities cited by both counsel, we take the law on this subject to be now well settled, that notice from any person who is a party to the bill, is sufficient and enures to the benefit of all the other parties. 3 *Kent's Commentaries*, 107; *Chitty on Bills*, 527; *Bailey*, 249; 2 *Campbell's Reports*, 373, *Jameson* vs. *Swinton;* 1 *Starkie*, 34, *Wilson* vs. *Swabey;* 3 *Wendell*, 173, *Chamoine* vs. *Fowler;* 7 *Bingham*, 530, *Solarte* vs. *Palmer*. If regard be had to the reason of the rule requiring notice, it is not easy to perceive the defendant's right to complain of that given to him in this case. From the correspondence between Berthoud and the defendant, and that between the latter and plaintiffs, it would appear that Berthoud was entrusted with collecting notes and business paper belonging to the defendants in New-York, and applying them to the payment of these drafts; having entirely failed in his collections in consequence of the extraordinary pressure then prevailing in that place, Berthoud advises defendant to make arrangements with the plaintiffs, and get from them time enough to enable him to make his collections; and we find defendant treating accordingly with the plaintiffs, and craving their indulgence as their acknowledged debtor. Under such circumstances, defendant had no step to take against the acceptor, to secure himself; but even if he had, the notice from Berthoud enabled him to act in the same manner as if it had come from the holders themselves.

2. But it is further objected, that the notice, admitting it to have been properly given by the acceptor, was premature, because the latter had the whole of the days on which he gave notice, to pay the bills. It does not appear at what time of the day the letters communicating notice were put in the post-office; the letter of the 3d of May, forwarded by the

EASTERN DIST.
*May,* 1840.

UNION BANK
*vs.*
GRIMSHAW.

The law is well settled that notice of the non-payment or dishonor of a bill given to the drawer by the acceptor, or any of the parties to it, is sufficient, and enures to the benefit of all the other parties.

EASTERN DIST. express mail, would seem to have been written in the after-
May, 1840. noon.  It begins with these words:  "Annexed you have
duplicate of what I wrote you *this morning*, per the common
mail."  After speaking of the gloomy state of affairs on that
day in Wall-street, it proceeds thus:  "I made another
attempt to discount paper to pay your draft of twenty-five
thousand dollars, due to-day ; but I could not succeed ; it will,
therefore, be protested."  In the duplicate enclosed in this
letter, Berthoud advises the defendant to make arrangements
with plaintiffs for all the bills which, he says, must inevitably
go back.  The letter of the 6th says:  "Your draft of two-
thirds of the account of J. R. & Co., for twenty thousand
dollars, due this day, *must* go back."  This very announcement

UNION BANK
*vs.*
GRIMSHAW.

Letters writ-
ten on the day
the bills become
due, by the ac-
ceptor, and ad-
dressed to the
drawer, that they
must go back
protested, is suf-
ficient notice to
him.
So, if a note
or bill is pre-
sented in the
forenoon of the
day it becomes
due, and pay-
ment is refused,
notice given in
the afternoon is
good.

of Berthoud that defendant's drafts must go back protested,
implies very thoroughly that it is in consequence of his de-
fault to pay them.  There is no question as to the legality
of the demand and protest, but the point is made as to the
regularity of the notice.  Can the defendant complain that
it was given the same day the bills were protested?  It has
been held, that if a note is presented in the forenoon of the
day it becomes due, and payment is refused, notice given in
the afternoon is good.  3 *Campbell*, 193, *Burridge* vs. *Man-
ners*.  It was urged, as in this case, that the notice was too
soon, because the maker had the whole day to pay the note ;
but Lord Ellenborough thought it a sufficient notice ; for as
soon as the maker refused payment, the note was dishonored.
The time of the day at which Berthoud's letters were writ-
ten, was a matter of fact to be inferred by the judge *a quo*,
from all the attending circumstances.  Of these, the strong-
est was, perhaps, the defendant's own correspondence with
the bank.  The letters of the 3d and 6th of May were before
him ; he might have ascertained, from Berthoud, the exact
moment when they were written.  And we find him, on the
20th May, 1837, and afterwards, on the 5th and 8th of Feb-
ruary, 1838, acknowledging, in the most unqualified manner,
his indebtedness to the bank, and craving their indulgence.
From these facts, it might well be inferred that defendant
had satisfied himself that these letters were written at a

proper time to fix responsibility upon him.  But, should the
correctness of the conclusion arrived at by the judge below
on this head be doubted, we think that defendant's prayer
for indulgence, and his repeated promises of payment,
amount to a waiver of notice, in case none had been given.
In defendant's first letter to the plaintiffs, after fully acknow-
ledging his obligation to pay his bills, he proposes to renew
them at four, six, eight and ten months sight, with interest,
under the most solemn assurances of payment.  Nine months
after, he writes two other letters in the same sense, asking
the plaintiffs' indulgence . on paying part, and offering addi-
tional security.

. It is objected that these propositions of defendant were
rejected; that his promises to pay were conditional; and that
it is not proved that he had, when he made them, a full
knowledge of the *laches* of the holders by which he was
discharged.

The defendant's propositions, it is true, were not formally
accepted, but in consequence of his unqualified acknowledg-
ment of the debt and positive assurances of payment, the
plaintiffs forebore to bring suit until the 22d of February,
1838; thus granting him a delay of nine months, a greater
or more advantageous indulgence than he had asked.

It does not appear to us that there is any condition in
defendant's letters; there is a *term of payment,* but not a *condi-
tion.*  They are two things very distinct; the former necessa-
rily presupposing a debt, and the latter not.  "A *term,*" says
*Pothier, No.* 230, *on Obligations,* " differs from a condition, in-
asmuch as a condition suspends *the engagement formed by the
agreement;* whereas.a *term* does not suspend the engagement,
but merely postpones the execution of it."  *Bailey on Bills,*
498, and *Notes,* states the law on this subject to be, that a
part payment without any objection being made for want of
notice, or a promise to pay, furnish grounds from which a
jury may infer presentment, notice and payment; that an
agreement with a prior endorser to pay the bill by *instalments*
is *evidence* in favor of a subsequent endorsee, that the party
agreeing to pay these instalments, had received due notice

EASTERN DIST.
*May,* 1840.

UNION BANK
*vs.*
GRIMSHAW.

Part payment,
or a promise to
pay a bill or
note, furnish
grounds to infer
presentment and
notice of the dis-
honor or non-
payment.

EASTERN DIST.
May, 1840.

So, where the defendant, as drawer of bills, after being advised by letter from the acceptor, of their dishonor, acknowledged the debt, and promised to pay the holder of the bills by instalments on short time, it must be viewed either as an admission that the notices were good, or a waiver of them.

of the dishonor.  Chief Justice Abbott, in deciding the case which settled the doctrine, said "had the defendant been discharged by want of notice, he would have insisted on his discharge; he would not have agreed to pay the bill."

As to the knowledge in defendant of the want of due diligence on the part of the plaintiffs, we think with the judge below that when he made his communications to the bank, he was fully apprised of the irregularity or defect, if any there was, in the notices he had received.  According to his declaration under oath to the interrogatories propounded by plaintiffs, he had no other notice than those contained in the letters of Berthoud; and it is in evidence that those letters were before him when he made his first proposition to the plaintiffs.  Defendant's acknowledgment of the debt, and his promise to pay it, must then be viewed either as an admission that the notices were good, or as a waiver of them, which his sense of the high moral obligation he was under to return the forty-five thousand dollars, received from plaintiffs, prompted him to make.

It is, therefore, ordered, adjudged and decreed, that the judgment of the District Court be affirmed, with costs.