# TXO PRODUCTION CORP. *v.* ALLIANCE RESOURCES CORP. ET AL.

No. 92–479.  Argued March 31, 1993—Decided June 25, 1993

444

STEVENS, J., announced the judgment of the Court and delivered an opinion, in which REHNQUIST, C. J., and BLACKMUN, J., joined, and in which KENNEDY, J., joined as to Parts I and IV. KENNEDY, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 466. SCALIA, J., filed an opinion concurring in the judgment, in which THOMAS, J., joined, *post*, p. 470. O'CONNOR, J., filed a dissenting opinion, in which WHITE, J., joined, and in which SOUTER, J., joined as to Parts II–B–2, II–C, III, and IV, *post*, p. 472.

*Carter G. Phillips* argued the cause for petitioner. With him on the briefs were *Rex E. Lee* and *Richard L. Horstman.*

*Laurence H. Tribe* argued the cause for respondents. With him on the brief were *Kenneth J. Chesebro, Wade T. Watson, Michael H. Gottesman,* and *G. David Brumfield.**

---

*Briefs of *amici curiae* urging reversal were filed for the American Automobile Manufacturers Association et al. by *Victor E. Schwartz;* for the American Council of Life Insurance et al. by *Erwin N. Griswold, Richard E. Barnsback, Phillip E. Stano, Theresa L. Sorota,* and *Patrick J. McNally;* for the American Tort Reform Association et al. by *Andrew L. Frey, Charles Rothfeld,* and *Fred J. Hiestand;* for Arthur Andersen & Co. et al. by *Leonard P. Novello, Jon N. Ekdahl, Harris J. Amhowitz, Howard J. Krongard, Carl D. Liggio,* and *Eldon Olson;* for the Business Council of Alabama by *Forrest S. Latta;* for the Center for Claims Resolution by *John D. Aldock* and *Frederick C. Schafrick;* for Continental Casualty Co. by *Rodney L. Eshelman, Donald T. Ramsey,* and *David M. Rice;* for the Equal Employment Advisory Council by *Robert E. Williams* and *Douglas S. McDowell;* for Owens-Illinois, Inc., et al. by *Walter Dellinger;* for the Product Liability Advisory Council, Inc., by *Malcolm E. Wheeler;* for the Securities Industries Association, Inc., by *Paul Windels III* and *William J. Fitzpatrick;* and for the Washington Legal Foundation by *Carolyn B. Kuhl, Daniel J. Popeo,* and *Paul D. Kamenar.*

Briefs of *amici curiae* urging affirmance were filed for the Alabama Trial Lawyers Association by *Bruce J. McKee;* for the Association of Trial Lawyers of America by *Jeffrey Robert White* and *Roxanne Barton Conlin;* for the Center for Auto Safety by *Clarence M. Ditlow III* and *Albert M. Pearson III;* for the Consumers Union of United States et al. by *An-*

JUSTICE STEVENS announced the judgment of the Court and delivered an opinion, in which THE CHIEF JUSTICE and JUSTICE BLACKMUN join, and in which JUSTICE KENNEDY joins as to Parts I and IV.

In a common-law action for slander of title, respondents obtained a judgment against petitioner for $19,000 in actual damages and $10 million in punitive damages. The question we granted certiorari to decide is whether that punitive damages award violates the Due Process Clause of the Fourteenth Amendment, either because its amount is excessive or because it is the product of an unfair procedure.

---

*drew F. Popper;* for the National Association of Securities and Commercial Law Attorneys by *Paul F. Bennett, David B. Gold, Kevin P. Roddy,* and *William S. Lerach;* for Public Citizen by *Leslie A. Brueckner* and *David C. Vladeck;* for Trial Lawyers for Public Justice by *Brent Rosenthal* and *Arthur H. Bryant;* for University Scholars and Law Professors by *Michael Rustad;* and for the West Virginia Trial Lawyers Association by *Mark M. Hager.*

Briefs of *amici curiae* were filed for the Attorney General of Alabama et al. by the Attorneys General, *pro se,* for their respective States as follows: *Darrell V. McGraw, Jr.,* of West Virginia, *Winston Bryant* of Arkansas, *James H. Evans* of Alabama, *Grant Woods* of Arizona, *Richard Blumenthal* of Connecticut, *Charles M. Oberly III* of Delaware, *Robert A. Butterworth* of Florida, *Robert A. Marks* of Hawaii, *Larry EchoHawk* of Idaho, *Bonnie J. Campbell* of Iowa, *Robert T. Stephan* of Kansas, *Chris Gorman* of Kentucky, *Hubert H. Humphrey III* of Minnesota, *Mike Moore* of Mississippi, *Jeremiah W. Nixon* of Missouri, *Joseph P. Mazurek* of Montana, *Tom Udall* of New Mexico, *Robert Abrams* of New York, *Michael F. Easley* of North Carolina, *Heidi Heitkamp* of North Dakota, *Lee Fisher* of Ohio, *Susan Brimer Loving* of Oklahoma, *Theodore R. Kulongoski* of Oregon, *Ernest D. Preate, Jr.,* of Pennsylvania, *T. Travis Medlock* of South Carolina, *Dan Morales* of Texas, and *Christine O. Gregoire* of Washington; for CBS, Inc., et al. by *P. Cameron DeVore, Marshall J. Nelson,* and *Douglas P. Jacobs;* for the Church of Scientology of California by *Eric M. Lieberman, Terry Gross,* and *Michael Lee Hertzberg;* and for Phillips Petroleum Co. et al. by *Theodore B. Olson, Larry L. Simms,* and *Theodore J. Boutrous, Jr.*

## I

On August 23, 1985, TXO Production Corp. (TXO) commenced this litigation by filing a complaint in the Circuit Court of McDowell County, West Virginia, for a declaratory judgment removing a cloud on title to an interest in oil and gas development rights. Respondents, including Alliance Resources Corp. (Alliance), filed a counterclaim for slander of title that went to trial before a jury in June 1990. The jury verdict in respondents' favor, which has been affirmed by the Supreme Court of Appeals of West Virginia, makes it appropriate to accept respondents' version of disputed issues of fact.

In 1984, geologists employed by TXO concluded that the recovery of oil and gas under the surface of a 1,002.74-acre tract of land known as the "Blevins Tract" would be extremely profitable. They strongly recommended that TXO—a large company that was engaged in oil and gas production in 25 States—obtain the rights to develop the oil and gas resources on the Blevins Tract.

Those rights were then controlled by Alliance.[1] Prodded by its geologists, TXO approached Alliance with what Alliance considered to be a "'phenomenal offer.'" 187 W. Va. 457, 462, 419 S. E. 2d 870, 875 (1992). TXO would pay Alliance $20 per acre in cash, pay 22 percent of the oil and gas revenues in royalties, and pay all of the development costs. On April 2, 1985, Alliance accepted TXO's offer, agreeing to assign its interest in the Tract to TXO. With respect to title to the property, Alliance agreed to return the consider-

---

[1] Alliance was the assignee of a leasehold interest that respondents George King and Grover C. Goode, doing business as Georgia Fuels, had obtained from respondent Tug Fork Land Company. Georgia Fuels reserved an overriding royalty interest in the lease.

ation paid to it if TXO's attorney determined that "title had failed."[2]

Shortly after the agreement was signed, TXO's attorneys discovered a 1958 deed conveying certain mineral rights in the Tract from respondent Tug Fork Land Company, a predecessor in interest of Alliance, to a coal operator named Leo J. Signaigo, Jr., who had later conveyed those rights to the Hawley Coal Mines Company, which had, in turn, reconveyed them to the Virginia Crews Coal Company (Virginia Crews). Interviews with Signaigo, and with representatives of Hawley and Virginia Crews, established that the parties all understood that only the right to mine coal had been involved in those transactions; none of them claimed any interest in oil or gas development rights. Moreover, the text of the 1958 deed made it "perfectly clear" that the grantor had reserved "all the oil and gas underlying" the Blevins Tract.[3]

TXO first advised Alliance of the "distinct possibility or probability" that its "leasehold title fails" in July 1985.[4] In the meantime, despite its knowledge that any claim that the 1958 deed created a cloud on title to the oil and gas develop-

---

[2] The agreement provided, in pertinent part:

"Assignor [Alliance] hereby warrants title to the extent that in the event of conducting title examination of the assigned acreage, Assignee's examining attorney determines that title has failed to all or any part of the assigned acreage, Assignor will reimburse to Assignee the consideration paid to it for any such lands to which title is determined to have failed." See 187 W. Va., at 463, n. 1, 419 S. E. 2d, at 876, n. 1.

[3] The West Virginia Supreme Court of Appeals "unequivocally [found] that the deed was unambiguous," id., at 464, 419 S. E. 2d, at 877, stating that "[a]lthough the deed does not demonstrate the most artful drafting, it does clearly reserve all of the oil and gas under the Blevins Tract to Tug Fork Land Company," id., at 463–464, 419 S. E. 2d, at 876–877 (emphasis in original). The entire deed is reprinted as Appendix A to the opinion of the State Supreme Court of Appeals. See id., at 467–471, 419 S. E. 2d, at 890–894.

[4] See Plaintiff's Exhibit No. 4, reprinted in App. to Reply Brief for Petitioner 1a.

ment rights would have been "frivolous,"[5] TXO made two attempts to lend substance to such a claim. First, after unsuccessfully trying to convince Virginia Crews that it had an interest in the oil and gas, TXO paid the company $6,000 for a quitclaim deed conveying whatever interest it might have to TXO. TXO recorded the deed without advising Alliance.[6] Second, TXO unsuccessfully attempted to induce Mr. Signaigo to execute a false affidavit indicating that the 1958 deed might have included oil and gas rights.

On July 12, after having recorded the quitclaim deed, TXO wrote to Alliance asserting that there was a title objection and implying that TXO might well have acquired the oil and gas rights from Virginia Crews. It then arranged a meeting in August and attempted to renegotiate the royalty arrangement. When the negotiations were unsuccessful, TXO commenced this litigation. According to the West Virginia Supreme Court of Appeals, TXO "knowingly and intentionally brought a frivolous declaratory judgment action" when its "real intent" was "to reduce the royalty payments under a 1,002.74 acre oil and gas lease," and thereby "increas[e] its interest in the oil and gas rights."[7]

TXO's declaratory judgment action was decided on the basis of the parties' written submissions. The court granted

---

[5] In the words of the West Virginia Supreme Court of Appeals: "In this case, TXO Production Corporation, a subsidiary of USX, knowingly and intentionally brought a frivolous declaratory judgment action against the appellees to clear a purported cloud on title." 187 W. Va., at 462, 419 S. E. 2d, at 875.

[6] According to an internal TXO memorandum, TXO viewed the quitclaim deed as offering "a chance of the court conferring TXO with 100% interest in the O[il] & G[as] estate as opposed to having a 78% net lease if the court rules in favor of Tug Fork's title." Plaintiff's Exhibit No. 8 (TXO Production Corp. Inter-Office Memorandum (May 30, 1985)). The West Virginia Supreme Court of Appeals referred to TXO's acquisition and recording of the quitclaim deed as nothing less than "an attempt to steal [Alliance's] land." 187 W. Va., at 468, 419 S. E. 2d, at 881.

[7] Id., at 462, 464, 419 S. E. 2d, at 875, 877.

respondents' motion to prohibit TXO from introducing expert and extrinsic evidence concerning the meaning of the 1958 deed to Signaigo because the deed itself was unambiguous. On the basis of the written record, the court found that TXO had asserted a claim to title to the oil and gas under the Blevins Tract by virtue of the quitclaim deed from Virginia Crews, App. 15, but that the deed was a "nullity."[8]

The counterclaim for slander of title was subsequently tried to a jury. In addition to the evidence that TXO knew that Alliance had good title to the oil and gas and that TXO had acted in bad faith when it advanced a claim on the basis of the worthless quitclaim deed in an effort to renegotiate its royalty arrangement, Alliance introduced evidence showing that TXO was a large company in its own right and a wholly owned subsidiary of an even larger company;[9] that the anticipated gross revenues from oil and gas development—and therefore the amount of royalties that TXO sought to renegotiate—were substantial;[10] and that TXO had

---

[8] "The Court further finds, as a matter of law, that TXO Production Corp. obtained no interest or title to the oil and gas underlying the 1,002.74 acres in question from Virginia Crews Coal Company by reason of the quit claim deed in question. The quit claim deed of Virginia Crews Coal Company conveyed no title to TXO Production Corp. because Virginia Crews Coal Company obtained no title to the oil and gas from Hawley Coal Mining Corporation and said quit claim deed is, therefore, a nullity." App. 18.

[9] Because TXO had refused to disclose any financial records in response to Alliance's discovery requests, Alliance employed an expert witness who analyzed public financial statements of TXO's parent, USX Corporation; he estimated that the TXO division of USX had a net worth of between "$2.2 billion and $2.5 billion." 187 W. Va., at 477, 419 S. E. 2d, at 890. Although TXO objected to the evidence as including assets of affiliates, it did not offer any rebuttal testimony on that issue. *Ibid.*

[10] Respondents introduced expert testimony demonstrating that the Blevins Tract could support between 15 and 25 wells. Tr. 98–99. A TXO executive confirmed that TXO intended, when it acquired the rights to develop the Blevins Tract, to develop multiple wells. *Id.,* at 673. Respondents also introduced an internal TXO memorandum, dated April 29, 1985, which showed that benchmark wells located near the Blevins Tract had reserves of 500,000 Mcf, and that the prevailing market rate was $3.00

engaged in similar nefarious activities in its business dealings in other parts of the country. 187 W. Va., at 468–470, 419 S. E. 2d, at 881–883.

The jury's verdict of $19,000 in actual damages was based on Alliance's cost of defending the declaratory judgment action. It is fair to infer that the punitive damages award of $10 million was based on other evidence.

In support of motions for judgment notwithstanding the verdict and for remittitur, TXO argued that the punitive damages award violated the Due Process Clause. Counsel contended that under the "general punitive damage instruction given in this case, the jury was left to their own devices without any yardstick as to what was a reasonable punitive damage award. And for that reason, a vagueness, lack of guideline and the lack of any requirement of a reasonable relationship between the actual injury and the punitive damage award, in essence, would cause the Court or should cause the Court to set it aside on Constitutional grounds."[11] In response, counsel for Alliance argued that the constitutional objection had been waived, that the misconduct was particularly egregious,[12] and that the award was not excessive.

---

Mcf. Trial testimony demonstrated that TXO was optimistic that the Blevins Tract would be quite profitable. See Tr. 672–673 (testimony of TXO official that the Blevins Tract was a good prospect, that it presented a "reasonably good opportunity," and that it offered the potential for the development of numerous wells).

Putting these figures together, respondents contend that TXO anticipated revenues of as high as $1.5 million for each well developed on the Tract. Brief for Respondents 3. Further extrapolating, respondents contend that "the value of the total income stream that TXO would expect from the Blevins Tract was somewhere between $22.5 million (with 15 wells) and $37.5 million (with 25 wells)." Id., at 4.

[11] App. to Pet. for Cert. 64a.

[12] In response to TXO's attempt to distinguish cases involving roughly comparable awards on the ground that they involved "egregious" conduct, the trial judge had interjected: "What could be more egregious than the vice president of a company saying, well, testifying and saying that he knew all along that this property belonged to Tug Fork?" Id., at 66a.

The trial court denied the motions without opinion and TXO appealed.[13]

On appeal, TXO assigned three primary errors: (1) that no cause of action for slander of title existed in West Virginia or had been established by the evidence; (2) that the West Virginia Rules of Evidence were violated by the admission of testimony of lawyers involved in litigation against TXO in other States to show TXO's wrongful intent; and (3) that the award of punitive damages violated the Due Process Clause as interpreted in our opinion in *Pacific Mut. Life Ins. Co.* v. *Haslip,* 499 U. S. 1 (1991), and in the West Virginia Supreme Court of Appeals' recent decision in *Garnes* v. *Fleming Landfill, Inc.,* 186 W. Va. 656, 413 S. E. 2d 897 (1991). The State Supreme Court of Appeals affirmed.

The court first disposed of the state-law issues.[14] It introduced its discussion of the federal issue by describing the kinds of defendants against whom punitive damages had been awarded after our decision in *Haslip.*[15] Turning to the

---

[13] *Id.,* at 71a–72a.

[14] "Slander of title," the court noted, "long has been recognized as a common law cause of action." 187 W. Va., at 465, 419 S. E. 2d, at 878. The court found that respondents had demonstrated all the elements of the tort: that TXO, by recording the frivolous quitclaim deed, had published a false statement derogatory to respondents' title, had done so with "malice," and had caused special damages, here the attorney's fees, as a result of its attack on respondents' interest in the oil and gas development rights. See *id.,* at 466–468, 419 S. E. 2d, at 879–881.

[15] "We have examined all of the punitive damages opinions issued since *Haslip* was decided in an attempt to find some pattern in what courts find reasonable. Generally, the cases fall into three categories: (1) really stupid defendants; (2) really mean defendants; and, (3) really stupid defendants who could have caused a great deal of harm by their actions but who actually caused minimal harm." *Id.,* at 474–475, 419 S. E. 2d, at 887–888. In a concurring opinion two justices criticized that categorization and stated that West Virginia's traditional rule summarizing the type of conduct that would give rise to punitive damages was better stated in the following syllabus:

" 'In actions of tort, where gross fraud, malice, oppression, or wanton, willful, or reckless conduct or criminal indifference to civil obligations affect-

facts of this case, the court stated that the application of its "reasonable relationship" test required it to consider these three factors:

> "(1) the potential harm that TXO's actions could have caused; (2) the maliciousness of TXO's actions; and (3) the penalty necessary to discourage TXO from undertaking such endeavors in the future." 187 W. Va., at 476, 419 S. E. 2d, at 889.

It held that each of those factors supported the award in this case, stating:

> "The type of *fraudulent* action *intentionally* undertaken by TXO in this case could potentially cause millions of dollars in damages to other victims. As for the reprehensibility of TXO's conduct, we can say no more than we have already said, and we believe the jury's verdict says more than we could say in an opinion twice this length. Just as important, an award of this magnitude is necessary to discourage TXO from continuing its pattern and practice of fraud, trickery and deceit." *Ibid.* (emphasis in original).

We granted certiorari, 506 U. S. 997 (1992), and now affirm.

## II

TXO first argues that a $10 million punitive damages award—an award 526 times greater than the actual damages awarded by the jury—is so excessive that it must be deemed an arbitrary deprivation of property without due process of law.

TXO correctly points out that several of our opinions have stated that the Due Process Clause of the Fourteenth

---

ing the rights of others appear, or where legislative enactment authorizes, it, the jury may assess exemplary, punitive, or vindictive damages. . . .'" *Id.*, at 484, 419 S. E. 2d, at 895.

Amendment imposes substantive limits "beyond which penalties may not go." *Seaboard Air Line R. Co.* v. *Seegers,* 207 U. S. 73, 78 (1907). See also *St. Louis, I. M. & S. R. Co.* v. *Williams,* 251 U. S. 63, 66–67 (1919); *Standard Oil Co. of Ind.* v. *Missouri,* 224 U. S. 270, 286 (1912).[16] Moreover, in *Southwestern Telegraph & Telephone Co.* v. *Danaher,* 238 U. S. 482 (1915), the Court actually set aside a penalty imposed on a telephone company on the ground that it was so "plainly arbitrary and oppressive" as to violate the Due Process Clause. *Id.,* at 491.[17] In an earlier case the Court had stated that it would not review state action fixing the penalties for unlawful conduct unless "the fines imposed are so grossly excessive as to amount to a deprivation of property without due process of law." *Waters-Pierce Oil Co.* v. *Texas (No. 1),* 212 U. S. 86, 111 (1909).

---

[16] In each of those cases, the Court actually found no constitutional violation. Thus, in the *Seaboard Air Line R. Co.* case, the Court concluded: "We know there are limits beyond which penalties may not go—even in cases where classification is legitimate—but we are not prepared to hold that the amount of penalty imposed is so great or the length of time within which the adjustment and payment are to be made is so short that the act imposing the penalty and fixing the time is beyond the power of the State." 207 U. S., at 78–79.

[17] In doing so, however, the Court emphasized the fact that the company was punished for conduct that had been undertaken in complete good faith. It noted:

"There was no intentional wrongdoing; no departure from any prescribed or known standard of action, and no reckless conduct. Some regulation establishing a mode of inducing prompt payment of the monthly rentals was necessary. It is not as if the company had been free to act or not as it chose. It was engaged in a public service which could not be neglected. The protection of its own revenues and justice to its paying patrons required that something be done. It acted by adopting the regulation and then impartially enforcing it. There was no mode of judicially testing the regulation's reasonableness in advance of acting under it, and, as we have seen, it had the support of repeated adjudications in other jurisdictions. In these circumstances to inflict upon the company penalties aggregating $6,300 was so plainly arbitrary and oppressive as to be nothing short of a taking of its property without due process of law." 238 U. S., at 490–491.

While respondents "unabashedly" denigrate those cases as "*Lochner*-era precedents,"[18] they overlook the fact that the Justices who had dissented in the *Lochner* case itself joined those opinions.[19] More importantly, respondents do not dispute the proposition that the Fourteenth Amendment imposes a substantive limit on the amount of a punitive damages award. Brief for Respondents 17. They contend, however, that the standard of review should be the same standard of rational-basis scrutiny that is appropriate for reviewing state economic legislation.

TXO, on the other hand, argues that punitive damages awards should be scrutinized more strictly than legislative penalties because they are typically assessed without any legislative guidance expressing the considered judgment of the elected representatives of the community.[20] TXO urges that we apply a form of heightened scrutiny, the first step of which is to apply certain "objective" criteria to determine whether a punitive award presumptively violates those notions of "fundamental fairness" inherent in the concept of due process of law. Relying heavily on the plurality opinion in *Schad* v. *Arizona*, 501 U. S. 624 (1991), petitioner argues that " 'history and widely shared practice [are] concrete indicators of what fundamental fairness and rationality require,' " Brief for Petitioner 15–16 (quoting *Schad*, 501 U. S., at 640 (plurality opinion), and that therefore we should examine, as "objective" criteria of fairness, (1) awards of punitive

---

[18] See Brief for Respondents 17–18.

[19] Justices Holmes, Harlan, White, and Day dissented in *Lochner* v. *New York*, 198 U. S. 45 (1905). See *id.*, at 65, 75. In all of the cases relied on by TXO, there were only two solitary dissents. Ironically, one of the two was that of Justice Peckham, the author of the majority opinion in *Lochner*. See *Seaboard Air Line R. Co.* v. *Seegers*, 207 U. S. 73, 79 (1907); 198 U. S., at 52. The comparison requires two caveats. Justice Harlan died in the fall of 1911, and therefore only participated in the *Seaboard Air Line* and *Waters-Pierce* cases. Also, Justice Day did not participate in the *Standard Oil* case.

[20] Brief for Petitioner 13–14.

damages upheld against other defendants in the same juris-
diction, (2) awards upheld for similar conduct in other juris-
dictions, (3) legislative penalty decisions with respect to sim-
ilar conduct, and (4) the relationship of prior punitive awards
to the associated compensatory awards, Brief for Petitioner
16.[21]  Under petitioner's proposed framework, when this
inquiry demonstrates that an award "exceeds the bounds
of contemporary and historical practice by *orders of magni-
tude*," *id.*, at 21 (emphasis in original), that award must be
struck down as arbitrary and excessive unless there is a
"compelling and particularized justification" for an award of
such size.[22]

The parties' desire to formulate a "test" for determining
whether a particular punitive award is "grossly excessive" is
understandable.  Nonetheless, we find neither formulation
satisfactory.  Under respondents' rational-basis standard,
apparently *any* award that would serve the legitimate state
interest in deterring or punishing wrongful conduct, no mat-
ter how large, would be acceptable.  On the other hand, we
reject the premise underlying TXO's invocation of height-
ened scrutiny.  The review of a jury's award for arbitrari-
ness and the review of legislation surely are significantly dif-
ferent.  Still, it is not correct to assume that the safeguards
in the legislative process have no counterpart in the judicial
process.  The members of the jury were determined to be
impartial before they were allowed to sit, their assessment
of damages was the product of collective deliberation based

---

[21] As counsel for petitioner noted at oral argument, these objective crite-
ria in part track the analysis of Justice Powell's opinion for the Court in
*Solem* v. *Helm*, 463 U. S. 277, 290–292 (1983).  See Tr. of Oral Arg. 26.

[22] Applying this "test," TXO concludes (not surprisingly) that the award
in this case exceeds prior awards given both within the State of West
Virginia and in other jurisdictions in allegedly comparable circumstances,
and cannot be defended as rationally related to a state interest in either
retribution or deterrence.  The punitive award in this case, petitioner con-
tends, is thus supported only by West Virginia's patently illegitimate in-
terest in redistributing wealth away from a large, out-of-state corporation.

on evidence and the arguments of adversaries, their award was reviewed and upheld by the trial judge who also heard the testimony, and it was affirmed by a unanimous decision of the State Supreme Court of Appeals. Assuming that fair procedures were followed, a judgment that is a product of that process is entitled to a strong presumption of validity. Indeed, there are persuasive reasons for suggesting that the presumption should be irrebuttable, see *Haslip*, 499 U. S., at 24–40 (SCALIA, J., concurring in judgment), or virtually so, *id.*, at 40–42 (KENNEDY, J., concurring in judgment).

Nor are we persuaded that reliance on petitioner's "objective" criteria is the proper course to follow. We have, of course, relied on history and "widely shared practice" as a guide to determining whether a particular state practice so departs from an accepted norm as to be presumptively violative of due process, see *Schad*, 501 U. S., at 637–643 (plurality opinion), and whether a term of imprisonment under certain circumstances is cruel and unusual punishment, see *Solem* v. *Helm*, 463 U. S. 277, 290–292 (1983). We question, however, the utility of such a comparative approach *as a test* for assessing whether a particular punitive award is presumptively unconstitutional.

It is a relatively straightforward task to draw intrajurisdictional and interjurisdictional comparisons on such matters as the definition of first-degree murder *(Schad)* or the penalty imposed on nonviolent repeat offenders *(Solem)*. The same cannot be said of the task of drawing such comparisons with regard to punitive damages awards by juries. Such awards are the product of numerous, and sometimes intangible, factors; a jury imposing a punitive damages award must make a qualitative assessment based on a host of facts and circumstances unique to the particular case before it. Because no two cases are truly identical, meaningful comparisons of such awards are difficult to make. Cf. *Haslip, supra,* at 41–42 (KENNEDY, J., concurring in judgment). Such analysis might be useful in considering whether a state practice

of permitting juries to rely on a particular factor, such as the defendant's out-of-state status, would violate due process.[23] As an analytical approach to assessing a particular award, however, we are skeptical. Thus, while we do not rule out the possibility that the fact that an award is significantly larger than those in apparently similar circumstances might, in a given case, be one of many relevant considerations, we are not prepared to enshrine petitioner's comparative approach in a "test" for assessing the constitutionality of punitive damages awards.

In the end, then, in determining whether a particular award is so "grossly excessive" as to violate the Due Process Clause of the Fourteenth Amendment, *Waters-Pierce Oil Co.*, 212 U. S., at 111, we return to what we said two Terms ago in *Haslip:* "We need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case. We can say, however, that [a] general concer[n] of reasonableness . . . properly enter[s] into the constitutional calculus." 499 U. S., at 18. And, to echo *Haslip* once again, it is with this concern for reasonableness in mind that we turn to petitioner's argument that the punitive award in this case was so "grossly excessive" as to violate the substantive component of the Due Process Clause.[24]

---

[23] Of course, such a state policy would likely be subject to challenge on other grounds as well.

[24] JUSTICE SCALIA's assertion notwithstanding, see *post*, at 471, we do not suggest that a defendant has a substantive due process right to a correct determination of the "reasonableness" of a punitive damages award. As JUSTICE O'CONNOR points out, state law generally imposes a requirement that punitive damages be "reasonable." See *post*, at 475–479. A violation of a state law "reasonableness" requirement would not, however, necessarily establish that the award is so "grossly excessive" as to violate the Federal Constitution. Furthermore, the fact that our cases have recognized for almost a century that the Due Process Clause of the Fourteenth Amendment imposes an outer limit on such an award does not,

## III

In support of its submission that this award is "grossly excessive," TXO places its primary emphasis on the fact that it is over 526 times as large as the actual damages award. TXO correctly notes that state courts have long held that "exemplary damages allowed should bear some proportion to the real damage sustained."[25]   Moreover, in our recent decision in *Haslip, supra,* in which we upheld a punitive damages award of four times the amount of compensatory damages, we noted that that award "may be close to the line" of constitutional permissibility.   *Id.,* at 23.   Following that decision, the West Virginia Supreme Court of Appeals had also observed that as "a matter of fundamental fairness, punitive damages should bear a reasonable relationship to compensatory damages."   *Garnes* v. *Fleming Landfill, Inc.,* 186 W. Va., at 668, 413 S. E. 2d, at 909.

That relationship, however, was only one of several factors that the state court mentioned in its *Garnes* opinion.   Earlier in its opinion it gave this example:

> "For instance, a man wildly fires a gun into a crowd. By sheer chance, no one is injured and the only damage is to a $10 pair of glasses.   A jury reasonably could find only $10 in compensatory damages, but thousands of dollars in punitive damages to teach a duty of care.   We

of course, make that Clause "the secret repository of all sorts of other, unenumerated, substantive rights," *post,* at 470 (SCALIA, J., concurring in judgment).   Indeed, it is ironic that JUSTICE SCALIA acknowledges that the Due Process Clause of the Fourteenth Amendment incorporates substantive guarantees of the Bill of Rights while relying on the enumeration of one of those rights (the Excessive Fines Clause of the Eighth Amendment) as evidence that such a right has no counterpart in the Due Process Clause.   *Post,* at 470–471.

[25] *Grant* v. *McDonogh,* 7 La. Ann. 447, 448 (1852); *Hunter* v. *Kansas City R. Co.,* 213 Mo. App. 233, 245, 248 S. W. 998, 1002 (1923); *Mobile & Montgomery R. Co.* v. *Ashcraft,* 48 Ala. 15, 33 (1872); *P. J. Willis & Bro.* v. *McNeill,* 57 Tex. 465, 480 (1882).

would allow a jury to impose substantial punitive damages in order to discourage future bad acts." *Id.*, at 661, 413 S. E. 2d, at 902 (citing C. Morris, Punitive Damages in Tort Cases, 44 Harv. L. Rev. 1173, 1181 (1931)).

When the court identified the several factors that should be mentioned in instructions to the jury, the first one that it mentioned reflected that example. It said:

"Punitive damages should bear a reasonable relationship to the harm *that is likely to occur from the defendant's conduct* as well as to the harm that actually has occurred. If the defendant's actions caused *or would likely cause* in a similar situation only slight harm, the damages should be relatively small. If the harm is grievous, the damages should be much greater." 186 W. Va., at 668, 413 S. E. 2d, at 909 (emphasis added).

Taking account of the potential harm that might result from the defendant's conduct in calculating punitive damages was consistent with the views we expressed in *Haslip, supra.* In that case we endorsed the standards that the Alabama Supreme Court had previously announced, one of which was "whether there is a reasonable relationship between the punitive damages award and *the harm likely to result* from the defendant's conduct as well as the harm that actually has occurred," *id.*, at 21 (emphasis added).

Thus, both State Supreme Courts and this Court have eschewed an approach that concentrates entirely on the relationship between actual and punitive damages. It is appropriate to consider the magnitude of the *potential harm* that the defendant's conduct would have caused to its intended victim if the wrongful plan had succeeded, as well as the possible harm to other victims that might have resulted if similar future behavior were not deterred. In this case the State Supreme Court of Appeals concluded that TXO's pattern of behavior "could potentially cause millions of dol-

lars in damages to other victims."[26]   Moreover, respondents argue that the record evidence would support a finding that Alliance's 22 percent share of the projected revenues from the full development of the oil and gas rights amounted to between $5 million and $8.3 million, depending on how many wells were developed.[27]   Even if these figures are exaggerated—as TXO persuasively argues, see Reply Brief for Petitioner 9–12—the jury could well have believed that TXO was seeking a multimillion dollar reduction in its potential royalty obligation.   In fact, in making their closing arguments to the jury, counsel for respondents stressed, in addition to TXO's vast wealth, the tremendous financial gains that TXO hoped to achieve through its "elaborate scheme."   Counsel for Alliance argued:

> "They wouldn't have gone to this elaborate scheme—No, they wouldn't now, because they thought this was a huge, gonna be a huge money-making lease.   Gonna puts lots of wells on it.   That's why it was worth the scheme.   And the punishment should fit it, and fit the wealth."   App. to Brief for Petitioner 23a.

Echoing the same theme, counsel for respondent Tug Fork Land Company argued:

> "You have to go on what TXO thought when they were going into this well.   They thought it was going to be a better well than it was.   But, see, it got caught up in this litigation and now, I submit to you, they are saying that it is not as good a well as it was.   And that's a fact that is in some contention here.   But regardless of how good it was, when they went in and did their operation back in May, June, July and August of 1985, they had projected that this would be a 20 year well and would produce a lot of money."   Tr. 748–749.

[26] 187 W. Va., at 476, 419 S. E. 2d, at 889.

[27] See n. 10, *supra*.

While petitioner stresses the shocking disparity between the punitive award and the compensatory award, that shock dissipates when one considers the potential loss to respondents, in terms of reduced or eliminated royalties payments, had petitioner succeeded in its illicit scheme. Thus, even if the actual value of the "potential harm" to respondents is not between $5 million and $8.3 million, but is closer to $4 million, or $2 million, or even $1 million, the disparity between the punitive award and the potential harm does not, in our view, "jar one's constitutional sensibilities." *Haslip*, 499 U. S., at 18.

In sum, we do not consider the dramatic disparity between the actual damages and the punitive award controlling in a case of this character. On this record, the jury may reasonably have determined that petitioner set out on a malicious and fraudulent course to win back, either in whole or in part, the lucrative stream of royalties that it had ceded to Alliance. The punitive damages award in this case is certainly large, but in light of the amount of money potentially at stake, the bad faith of petitioner, the fact that the scheme employed in this case was part of a larger pattern of fraud, trickery and deceit, and petitioner's wealth,[28] we are not persuaded that the award was so "grossly excessive" as to be beyond the power of the State to allow.

## IV

TXO also argues that the punitive damages award is the result of a fundamentally unfair procedure because the jury

---

[28] TXO also contends that the admission of evidence of its alleged wrongdoing in other parts of the country, as well as the evidence of its impressive net worth, led the jury to base its award on impermissible passion and prejudice. Brief for Petitioner 22–23. Under well-settled law, however, factors such as these are typically considered in assessing punitive damages. Indeed, the Alabama factors we approved in *Haslip* included both. See *Pacific Mut. Life Ins. Co.* v. *Haslip*, 499 U. S. 1, 21–22 (1991) ("(b) . . . the existence and frequency of similar past conduct; . . . (d) the 'financial position' of the defendant").

was not adequately instructed, because its award was not adequately reviewed by the trial or the appellate court, and because TXO had no advance notice that the jury might be allowed to return such a large award or to rely on potential harm as a basis for its calculation. We decline to address the first argument as it was not argued or passed on below. We find the remaining arguments meritless.

The instruction to the jury on punitive damages differed from that found adequate in *Haslip,* see 499 U. S., at 6, n. 1, in two significant respects. It authorized the jury to take account of "the wealth of the perpetrator" in recognition of the fact that effective deterrence of wrongful conduct "may require a larger fine upon one of large means than it would upon one of ordinary means under the same or similar circumstances."[29] It also stated that one of the purposes of punitive damages is "to provide additional compensation for

---

[29] The instruction on punitive damages, to which TXO objected, read as follows:

"In addition to actual or compensatory damages, the law permits the jury, under certain circumstances, to make an award of punitive damages, in order to punish the wrongdoer for his misconduct, to serve as an example or warning to others not to engage in such conduct and to provide additional compensation for the conduct to which the injured parties have been subjected.

"If you find from a preponderance of the evidence that TXO Production Corp. is guilty of wanton, wilful, malicious or reckless conduct which shows an indifference to the right of others, then you may make an award of punitive damages in this case.

"In assessing punitive damages, if any, you should take into consideration all of the circumstances surrounding the particular occurrence, including the nature of the wrongdoing, the extent of the harm inflicted, the intent of the party committing the act, the wealth of the perpetrator, as well as any mitigating circumstances which may operate to reduce the amount of the damages. The object of such punishment is to deter TXO Production Corp. and others from committing like offenses in the future. Therefore the law recognizes that to in fact deter such conduct may require a larger fine upon one of large means than it would upon one of ordinary means under the same or similar circumstances." App. 34–35.

TXO did not propose a different instruction.

the conduct to which the injured parties have been subjected." See n. 29, *supra.*

We agree with TXO that the emphasis on the wealth of the wrongdoer increased the risk that the award may have been influenced by prejudice against large corporations, a risk that is of special concern when the defendant is a nonresident. We also do not understand the reference in the instruction to "additional compensation." We note, however, that in *Haslip* we referred to the "financial position" of the defendant as one factor that could be taken into account in assessing punitive damages, see n. 28, *supra.* We also note that TXO did not squarely argue in the West Virginia Supreme Court of Appeals that these aspects of the jury instruction violated the Due Process Clause, see Brief for Appellant in No. 20281 (W. Va. Sup. Ct.), pp. 44–48,[30] possibly because many States permit the jury to take account of the defendant's wealth.[31] Because TXO's constitutional attack on the jury instructions was not properly presented to the highest court of the State, *Bankers Life & Casualty Co.* v. *Crenshaw,* 486 U. S. 71, 77–80 (1988), we do not pass on it.

The only basis for criticizing the trial judge's review of the punitive damages award is that he did not articulate his reasons for upholding it. He did, however, give counsel an adequate hearing on TXO's postverdict motions, and during one colloquy indicated his agreement with the jury's appraisal of

---

[30] In fact, in its brief before that court, petitioner stated that "[i]t is clear under West Virginia law that the financial standing *of the defendant* is an element to be taken into consideration in determining the proper measure of punitive or exemplary damages." Brief for Appellant in No. 20281 (W. Va. Sup. Ct.), p. 37 (emphasis in original). There is no hint in that brief that petitioner thought that this state rule violated due process.

[31] See, *e. g., Wagner* v. *McDaniels,* 9 Ohio St. 3d 184, 186–187, 459 N. E. 2d 561, 564 (1984); *Gamble* v. *Stevenson,* 305 S. C. 104, 111, n. 3, 406 S. E. 2d 350, 354, n. 3 (1991); *Lunsford* v. *Morris,* 746 S. W. 2d 471, 473 (Tex. 1988); *Viking Ins. Co.* v. *Jester,* 310 S. C. 317, 332, 836 S. W. 2d 371, 379 (Ark. 1992).

the egregious character of the conduct of TXO's executives. See n. 12, *supra.* While it is always helpful for trial judges to explain the basis for their rulings as thoroughly as is consistent with the efficient dispatch of their duties, we certainly are not prepared to characterize the trial judge's failure to articulate the basis for his denial of the motions for judgment notwithstanding the verdict and for remittitur as a constitutional violation.

Petitioner's criticism of the West Virginia Supreme Court of Appeals' opinion is based largely on the court's colorful reference to classes of "really mean" and "really stupid" defendants. That those terms played little, if any, part in its actual evaluation of the propriety of the damages award is evident from the reasoning in its thorough opinion, succinctly summarized in passages we have already quoted. Moreover, two members of the court who wrote separately to disassociate themselves from the "really mean" and "really stupid" terminology shared the views of the rest of the members of the court on the merits. See 187 W. Va., at 484, 419 S. E., at 895 (McHugh, C. J., concurring). The opinion was unanimous and gave careful attention to the relevant precedents, including our decision in *Haslip* and their own prior decision in *Garnes.*

Finally, we find no merit in TXO's argument that the procedure followed in this case "was unconstitutionally vague" because petitioner had no notice of the possibility that the award of punitive damages might be divorced from an award of compensatory damages. In *Wells* v. *Smith,* 171 W. Va. 97, 105, 297 S. E. 2d 872, 880 (1982), the West Virginia Supreme Court of Appeals held that a defendant could be liable for punitive damages even if the jury did not award the plaintiff *any* compensatory damages.[32] In any event, the notice com-

---

[32] In *Garnes* v. *Fleming Landfill, Inc.,* 186 W. Va. 656, 413 S. E. 2d 897 (1991), which was decided well after the underlying conduct in this case occurred, the West Virginia Supreme Court of Appeals overturned that aspect of *Wells,* holding instead that the jury must award *some* amount of compen-

ponent of the Due Process Clause is satisfied if prior law fairly indicated that a punitive damages award might be imposed in response to egregiously tortious conduct. *Haslip*, 499 U. S., at 24, n. 12. Prior law, in West Virginia and elsewhere, unquestionably did so.

The judgment of the West Virginia Supreme Court of Appeals is affirmed.

*It is so ordered.*

JUSTICE KENNEDY, concurring in part and concurring in the judgment.

I concur in the plurality's statement of the case and in Part IV of the plurality opinion, in which the plurality holds that the judicial procedures that were followed in awarding punitive damages against TXO fulfilled the constitutional requirement of due process of law. I am not in full agreement, however, with the plurality's discussion of the substantive requirements of the Due Process Clause in Parts II and III, in which it concentrates on whether the punitive damages award was "'grossly excessive.'" *Ante*, at 458, 462. I agree that the approaches proposed by the parties to this case are unsatisfactory, see *ante*, at 456–458, but I do not believe that the plurality's replacement, a general focus on the "'reasonableness'" of the award, *ante*, at 458, quoting *Pacific Mut. Life Ins. Co.* v. *Haslip*, 499 U. S. 1, 18 (1991), is a significant improvement. To ask whether a particular award of punitive damages is grossly excessive begs the question: excessive in relation to what? The answer excessive in relation to the conduct of the tortfeasor may be correct, but it is unhelpful, for we are still bereft of any standard by which to compare the punishment to the malefaction that gave rise to it. A reviewing court employing this formulation comes close to relying upon nothing more than its own subjective reaction to a particular punitive

satory damages before it can award punitive damages. See 186 W. Va., at 667, 413 S. E. 2d, at 908.

damages award in deciding whether the award violates the Constitution. This type of review, far from imposing meaningful, law-like restraints on jury excess, could become as fickle as the process it is designed to superintend. Furthermore, it might give the illusion of judicial certainty where none in fact exists, and, in so doing, discourage legislative intervention that might prevent unjust punitive awards.

As I have suggested before, see *id.*, at 41 (opinion concurring in judgment), a more manageable constitutional inquiry focuses not on the amount of money a jury awards in a particular case but on its reasons for doing so. The Constitution identifies no particular multiple of compensatory damages as an acceptable limit for punitive awards; it does not concern itself with dollar amounts, ratios, or the quirks of juries in specific jurisdictions. Rather, its fundamental guarantee is that the individual citizen may rest secure against arbitrary or irrational deprivations of property. When a punitive damages award reflects bias, passion, or prejudice on the part of the jury, rather than a rational concern for deterrence and retribution, the Constitution has been violated, no matter what the absolute or relative size of the award. JUSTICE O'CONNOR is correct in observing that in implementing this principle, courts have often looked to the size of the award as one indication that it resulted from bias, passion, or prejudice, see *post*, at 476–478, but that is not the sole, or even necessarily the most important, sign. Other objective indicia of the type discussed by the plurality, see *ante*, at 455–457, as well as direct evidence from the trial record, are also helpful in ascertaining whether a jury stripped a party of its property in an arbitrary way and not in accordance with the standards of rationality and fairness the Constitution requires.

The plurality suggests that the jury in this case acted in conformance with these standards of rationality in large part on the basis of what it perceives to be the rational relation

between the size of the award and the degree of harm threatened by TXO's conduct. See *ante,* at 460–462. I do not agree that this provides a constitutionally adequate foundation for concluding that the punitive damages verdict against TXO was rational. It is a commonplace that a jury verdict must be reviewed in relation to the record before it. See, *e. g., Jackson* v. *Virginia,* 443 U. S. 307 (1979). Unlike a legislature, whose judgments may be predicated on educated guesses and need not necessarily be grounded in facts adduced in a hearing, see, *e. g., Heller* v. *Doe, ante,* at 320; *FCC* v. *Beach Communications, Inc.,* 508 U. S. 307, 315 (1993); *Vance* v. *Bradley,* 440 U. S. 93, 111 (1979), a jury is bound to consider only the evidence presented to it in arriving at a judgment. JUSTICE O'CONNOR demonstrates that the record in this case does not contain evidence, argument, or instructions regarding the potential harm from TXO's conduct and so would not have permitted a reasonable jury to render its verdict on this basis. See *post,* at 484–489. We must therefore look for other explanations of the jury verdict to decide whether it may stand.

On its facts, this case is close and difficult; JUSTICE O'CONNOR makes a plausible argument, based on the record and the trial court's instructions, that the size of the punitive award is explained by the jury's raw, redistributionist impulses stemming from antipathy to a wealthy, out-of-state, corporate defendant. See *post,* at 492–494. There is, however, another explanation for the jury verdict, one supported by the record and relied upon by the state courts, that persuades me that I cannot say with sufficient confidence that the award was unjustified or improper on this record: TXO acted with malice. This was not a case of negligence, strict liability, or *respondeat superior.* TXO was found to have committed, through its senior officers, the intentional tort of slander of title. The evidence at trial demonstrated that it acted, in the West Virginia Supreme

Court of Appeals' words, through a "pattern and practice of fraud, trickery and deceit" and employed "unsavory and malicious practices" in the course of its business dealings with respondent. 187 W. Va. 457, 477, 467, 419 S. E. 2d 870, 890, 880 (1992). "[T]he record shows that this was not an isolated incident on TXO's part—a mere excess of zeal by poorly supervised, low level employees—but rather part of a pattern and practice by TXO to defraud and coerce those in positions of unequal bargaining power." *Id.*, at 468, 419 S. E. 2d, at 881.

Although in many respects this case represents an odd application of an already unusual tort, it was rational for the jury to place great weight on the evidence of TXO's deliberate, wrongful conduct in determining that a substantial award was required in order to serve the goals of punishment and deterrence. I confess to feeling a certain degree of disquiet in affirming this award, but the record, when viewed as a whole, makes it probable that the jury's verdict was motivated by a legitimate concern for punishing and deterring TXO, rather than by bias, passion, or prejudice. There was ample evidence of willful and malicious conduct by TXO in this case; the jury heard evidence concerning several prior lawsuits filed against TXO accusing it of similar misdeeds; and respondents' attorneys informed the jury of TXO's vast financial resources and argued that TXO would suffer only as a result of a large judgment. Compared with this evidence and argumentation, which dominates the record of the trial, the subtler and more isolated appeals based on TXO's out-of-state status on which JUSTICE O'CONNOR focuses were of lesser importance. A case involving vicarious liability, negligence, or strict liability might present different issues. But given the record here, I am satisfied that the jury's punitive damages award did not amount to an unfair, arbitrary, or irrational seizure of TXO's property.

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, concurring in the judgment.

The jury in this case was instructed on the purposes of punitive damages under West Virginia law, and its award was reviewed for reasonableness by the trial court and the West Virginia Supreme Court of Appeals. Traditional American practice governing the imposition of punitive damages requires no more. See *Pacific Mut. Life Ins. Co.* v. *Haslip*, 499 U. S. 1, 15 (1991); *id.*, at 26–27 (SCALIA, J., concurring in judgment). It follows, in my view, that petitioner's claims under the Due Process Clause of the Fourteenth Amendment must fail. See *id.*, at 31. I therefore have no difficulty joining the Court's judgment.

I do not, however, join the plurality opinion, since it makes explicit what was implicit in *Haslip:* the existence of a so-called "substantive due process" right that punitive damages be reasonable, see *ante*, at 458.* I am willing to accept the proposition that the Due Process Clause of the Fourteenth Amendment, despite its textual limitation to procedure, incorporates certain substantive guarantees specified in the Bill of Rights; but I do not accept the proposition that it is the secret repository of all sorts of other, unenumerated, substantive rights—however fashionable that proposition may have been (even as to economic rights of the sort involved here) at the time of the *Lochner*-era cases the plural-

---

*JUSTICE STEVENS asserts that there is a difference between the constitutional standard that he today proposes, which he describes as "grossly excessive" (a term used in one of the *Lochner*-era cases he relies upon, *Waters-Pierce Oil Co.* v. *Texas (No. 1)*, 212 U. S. 86, 111 (1909)), and the standard of "reasonableness" that state courts have traditionally applied. *Ante*, at 458–459, n. 24. I doubt whether there is a difference between the two. As JUSTICE O'CONNOR points out, see *post*, at 476–478, state courts often used terms like "grossly excessive" to describe the sort of award that could not stand. But if there *is* a difference, then one must wonder—since it is not based upon any common-law tradition—where the standard of "grossly-excessive-that-means-something-even-worse-than-unreasonable" comes from.

ity relies upon, see *ante*, at 453–454. It is particularly difficult to imagine that "due process" contains the substantive right not to be subjected to excessive punitive damages, since if it contains *that* it would surely also contain the substantive right not to be subjected to excessive fines, which would make the Excessive Fines Clause of the Eighth Amendment superfluous in light of the Due Process Clause of the Fifth Amendment.

To say (as I do) that "procedural due process" requires judicial review of punitive damages awards for reasonableness is not to say that there is a federal constitutional right to a substantively correct "reasonableness" determination—which is, in my view, what the plurality tries to assure today. Procedural due process also requires, I am certain, judicial review of the sufficiency of the evidence to sustain a civil jury verdict, and judicial review of the reasonableness of jury-awarded compensatory damages (including damages for pain and suffering); but no one would claim (or at least no one has yet claimed) that a substantively correct determination of sufficiency of evidence and reasonableness of compensatory damages is a federal constitutional right. So too, I think, with punitive damages: *Judicial* assessment of their reasonableness is a federal right, but a *correct* assessment of their reasonableness is not.

Today's reprise of *Haslip*, despite the widely divergent opinions it has produced, has not been a waste. The procedures approved here, *ante*, at 463–466 (plurality opinion), are far less detailed and restrictive than those upheld in *Haslip*, *supra*, at 19–23, suggesting that if the Court ever does invent new procedural requirements, they will not deviate significantly from the traditional ones that ought to govern. And the disposition of the "substantive due process" claim demonstrates that the Court's " 'constitutional sensibilities' " are far more resistant to " 'jar[ring],' " *ante*, at 462 (plurality opinion) (quoting *Haslip*, *supra*, at 18), than one might have imagined after *Haslip*. There the Court said a 4-to-1 ratio

between punitive damages and actual damages "may be close to the line" of "constitutional impropriety," *Haslip, supra,* at 23–24; today we decide that a *10*-to-1 ratio between punitive damages and *the potential harm of petitioner's conduct* passes muster—calculating that potential harm, very generously, to be more than *50* times the $19,000 in actual damages that respondents suffered, see *ante,* at 460–462 (plurality opinion).

The plurality's decision is valuable, then, in that the great majority of due process challenges to punitive damages awards can henceforth be disposed of simply with the observation that "this is no worse than *TXO.*" I would go further, to shut the door the plurality leaves slightly ajar. As I said in *Haslip,* the Constitution gives federal courts no business in this area, except to assure that due process (*i. e.,* traditional procedure) has been observed. 499 U. S., at 27–28 (opinion concurring in judgment). State legislatures and courts have ample authority to eliminate any perceived "unfairness" in the common-law punitive damages regime, and have frequently exercised that authority in recent years. See *id.,* at 39; Brief for Attorney General of Alabama et al. as *Amici Curiae* 14–17 (collecting state statutes and cases); Brief for National Association of Securities and Commercial Law Attorneys as *Amicus Curiae* 16–30 (same). The plurality's continued assertion that federal judges have *some,* almost-never-usable, power to impose a standard of "reasonable punitive damages" through the clumsy medium of the Due Process Clause serves only to spawn wasteful litigation, and to reduce the incentives for the proper institutions of our society to undertake that task.

JUSTICE O'CONNOR, with whom JUSTICE WHITE joins, and with whom JUSTICE SOUTER joins as to Parts II–B–2, II–C, III, and IV, dissenting.

In *Pacific Mut. Life Ins. Co.* v. *Haslip,* 499 U. S. 1 (1991), this Court held out the promise that punitive damages

awards would receive sufficient constitutional scrutiny to restore fairness in what is rapidly becoming an arbitrary and oppressive system. Today the Court's judgment renders *Haslip*'s promise a false one. The procedures that converted this commercial dispute into a $10 million punitive verdict were wholly inadequate. Rather than producing a judgment founded on verifiable criteria, they produced a monstrous award—526 times actual damages and over 20 times greater than any punitive award in West Virginia history. Worse, the State Supreme Court of Appeals rejected petitioner's challenge with only cursory analysis, observing that petitioner, rather than being "really stupid," had been "really mean." 187 W. Va. 457, 474–475, 419 S. E. 2d 870, 887–889 (1992). The court similarly refused to consider the possibility of remittitur because petitioner "and its agents and servants failed to conduct themselves as gentlemen." *Id.*, at 462, 419 S. E. 2d, at 875. In my view, due process does not tolerate such cavalier standards when so much is at stake. Because I believe that neither this award's size nor the procedures that produced it are consistent with the principles this Court articulated in *Haslip*, I respectfully dissent.

## I

Our system of justice entrusts jurors—ordinary citizens who need not have any training in the law—with profoundly important determinations. Jurors decide not only civil matters, where the financial consequences may be great, but also criminal cases, where the liberty or perhaps life of the defendant hangs in the balance. Our abiding faith in the jury system is founded on longstanding tradition reflected in constitutional text, see U. S. Const., Art. III, § 2, Amdts. 6, 7, and is supported by sound considerations of justice and democratic theory. The jury system long has been a guarantor of fairness, a bulwark against tyranny, and a source of civic values. See 3 W. Blackstone, Commentaries *379–*381; *Haslip*, *supra*, at 40 (KENNEDY, J., concurring in judgment);

W. Olson, The Litigation Explosion 175 (1991); Hyman & Tarrant, Aspects of American Trial Jury History, in The Jury System in America 23, 27–28 (R. Simon ed. 1975).

But jurors are not infallible guardians of the public good. They are ordinary citizens whose decisions can be shaped by influences impermissible in our system of justice. In fact, they are more susceptible to such influences than judges. See H. Kalven & H. Zeisel, The American Jury 497–498 (1966) ("The judge very often perceives the stimulus that moves the jury, but does not yield to it. . . . The perennial amateur, layman jury cannot be so quickly domesticated to official role and tradition; it remains accessible to stimuli which the judge will exclude"). Arbitrariness, caprice, passion, bias, and even malice can replace reasoned judgment and law as the basis for jury decisionmaking. Modern judicial systems therefore incorporate safeguards against such influences. Rules of evidence limit what the parties may present to the jury. Careful instructions direct the jury's deliberations. Trial judges diligently supervise proceedings, watchful for potential sources of error. And courts of appeals stand ready to overturn judgments when efforts to ensure fairness have failed.

In the usual case, this elaborate but necessary judicial machinery functions well, ensuring that our jury system is an engine of liberty and justice rather than a source of oppression and arbitrary imposition. As JUSTICE KENNEDY has explained, "[e]lements of whim and caprice do not predominate when the jury reaches a consensus based upon arguments of counsel, the presentation of evidence, and instructions from the trial judge, subject to review by the trial and appellate courts." *Haslip*, 499 U. S., at 40 (opinion concurring in judgment). But the risk of prejudice, bias, and caprice remains a real one in every case nonetheless.

This is especially true in the area of punitive damages, where juries sometimes receive only vague and amorphous guidance. Jurors may be told that punitive damages are im-

posed to punish and deter, but rarely are they instructed on how to effectuate those goals or whether any limiting principles exist. See, *e. g., id.,* at 39. Although this Court has not held such instructions constitutionally inadequate, it cannot be denied that the lack of clear guidance heightens the risk that arbitrariness, passion, or bias will replace dispassionate deliberation as the basis for the jury's verdict. See *id.,* at 43, 63 (O'CONNOR, J., dissenting); *id.,* at 41 (KENNEDY, J., concurring in judgment) ("[T]he generality of the instructions may contribute to a certain lack of predictability"); *Browning-Ferris Industries of Vt., Inc.* v. *Kelco Disposal, Inc.,* 492 U. S. 257, 281 (1989) (Brennan, J., concurring) (Such "skeletal" guidance is "scarcely better than no guidance at all," creating a need for more careful review); *Smith* v. *Wade,* 461 U. S. 30, 88 (1983) (REHNQUIST, J., dissenting) (elastic standards applicable to punitive awards "giv[e] free reign to the biases and prejudices of juries"). As one commentator has explained:

> "Like everyone else in the court system, juries need and deserve objective rules for decision. Deprived of any fixed landmarks and guideposts, any of us can be distracted, played on, and befuddled to the point where our best guess is far from reliable." Olson, *supra,* at 175.

It is therefore no surprise that, time and again, this Court and its Members have expressed concern about punitive damages awards " 'run wild,' " inexplicable on any basis but caprice or passion. *Haslip, supra,* at 9–12, 18 (discussing cases); see also *Gertz* v. *Robert Welch, Inc.,* 418 U. S. 323, 350 (1974) ("[J]uries assess punitive damages in wholly unpredictable amounts bearing no necessary relation to the actual harm caused").

Influences such as caprice, passion, bias, and prejudice are antithetical to the rule of law. If there is a fixture of due process, it is that a verdict based on such influences cannot

stand. See *Haslip, supra*, at 41 (KENNEDY, J., concurring in judgment) ("A verdict returned by a biased or prejudiced jury no doubt violates due process"). Of course, determining whether a verdict resulted from improper influences is no easy matter. By tradition and necessity, the circumstances in which jurors may impeach their own verdict are quite limited. See *Tanner* v. *United States*, 483 U. S. 107, 117–121, 127 (1987); 11 C. Wright & A. Miller, Federal Practice and Procedure § 2810, pp. 71–72 (1973); 2 W. Tidd, Practice of Courts of King's Bench and Common Pleas *908–*909. But fundamental fairness requires that impermissible influences such as bias and prejudice be discovered nonetheless, by inference if not by direct proof. As a result, courts at common law in England traditionally would strike any award that appeared so grossly disproportionate as to evidence caprice, passion, or bias.[1] This practice long has been followed

---

[1] See *Hewlett* v. *Cruchley*, 5 Taunt. 277, 281, 128 Eng. Rep. 696, 698 (C. P. 1813) (Mansfield, C. J.) ("[I]t is now well acknowledged in all the Courts of *Westminsterhall* [that] if the damages are clearly too large, the Courts will send the inquiry to another jury"); *Duberly* v. *Gunning*, 4 Durn. & E. 651, 657 (K. B. 1792) (Buller, J.) ("New trials have been granted from the year 1655" on "the grounds . . . of excessive damages"); *Chambers* v. *Caulfield*, 6 East. 244, 256, 102 Eng. Rep. 1280, 1285 (K. B. 1805) (Lord Ellenborough, C. J.) ("[I]f it appeared to us from the amount of the damages given as compared with the facts of the case laid before the jury, that the jury must have acted under the influence either of undue motives, or some gross error or misconception on the subject, we should have thought it our duty to submit the question to the consideration of a second jury"); *Leith* v. *Pope*, 2 Bl. W. 1327, 1328, 96 Eng. Rep. 777, 778 (K. B. 1782) (award will be reversed only where "so flagrantly excessive as to afford an internal evidence of the prejudice and partiality of the jury"); *Fabrigas* v. *Mostyn*, 2 Bl. W. 928, 96 Eng. Rep. 549 (K. B. 1774) ("Some [awards] may be so monstrous and excessive, as to be in themselves an evidence of passion or partiality in the jury"); *Gilbert* v. *Burtenshaw*, 1 Cowp. 230, 231, 98 Eng. Rep. 1059, 1060 (K. B. 1774) (Court may grant new trial only where damages are so "flagrantly outrageous and extravagant" as to constitute "internal evidence of intemperance in the minds of the jury"); 2 Tidd, Practice of Courts of King's Bench and Common Pleas, at *909 (A new trial may be had "for excessive damages" but "the damages ought not to be weighed

in this Nation as well.[2]  Indeed, the New Hampshire Supreme Court emphasized its importance over a century ago, observing that a court's duty to interfere with a disproportionate jury verdict "is absolutely necessary to the safe administration of justice, and ought, in all proper cases, to be asserted and exercised."  *Belknap* v. *Boston & Maine R. Co.*, 49 N. H. 358, 372 (1870).  Accord, *Gough* v. *Farr*, 1 Y. & J. 477, 479–480, 148 Eng. Rep. 759, 760 (Ex. 1827) (Vaughan, B.) ("It is essential to the due administration of justice, that the Courts should exercise a salutary control over Juries" by requiring retrial where the amount of the verdict indicates that the jury "acted improperly, or upon a gross misconception of the facts"); *id.*, at 478–479, 148 Eng. Rep., at 759–760

---

in a nice balance, but must be such as appear at first blush to be outrageous, and indicate passion or partiality in the jury").

[2] G. Field, Law of Damages 685–686 (1876) ("[W]hen the verdict of the jury is so flagrantly excessive that the mind at once perceives that the verdict is unjust, it should be set aside"); *id.*, at 684 (Court may set award aside "where it is apparent, from the amount of the verdict or otherwise, that the jury were influenced by passion, prejudice, corruption, or an evident mistake of the law or the facts"); 1 J. Sutherland, Law of Damages 810 (1882) (Where "the amount is so great or so small as to indicate" that "it is the result of a perverted judgment, and not that of [the jury's] cool and impartial deliberation," the court, "in its discretion, will interpose and set it aside"); *Travis* v. *Barger*, 24 Barb. 614, 629 (N. Y. 1857) (Damages award will be set aside where "so flagrantly outrageous and extravagant" as to evince "intemperance, passion, partiality or corruption"); *Pleasants* v. *Heard*, 15 Ark. 403, 406 (1855) (verdict to be set aside if the "amount of damages, upon all the facts of the case, . . . shocks our sense of justice"); *Worster* v. *Proprietors of Canal Bridge*, 33 Mass. 541, 547–548 (1835) (Court may interfere where damages are "manifestly exorbitant"); *Belknap* v. *Boston & Maine R. Co.*, 49 N. H. 358, 372 (1870) (Where damages are so excessive that one familiar with case would conclude that the "jury . . . acted under the influence of a perverted judgment, it is the duty of the court in the exercise of a sound discretion to grant a new trial"). Accord, *Pacific Mut. Life Ins. Co.* v. *Haslip*, 499 U. S. 1, 41 (1991) (KENNEDY, J., concurring in judgment) ("[T]he extreme amount of an award compared to the actual damage inflicted can be some evidence of bias or prejudice in an appropriate case").

(Alexander, L. C. B.) (Where damages are so excessive that "the Courts are of opinion . . . that the Jury have acted under the influence of undue motives, or of misconception, it is their duty to interfere"); *Travis* v. *Barger*, 24 Barb. 614, 629 (N. Y. 1857) (reciting Lord Ellenborough's view that, "if it appeared from the amount of damages given, as compared with the facts of the case laid before jury, that the jury must have acted under the influence either of undue motives, or some gross error or misconception of the subject, the court would have thought it their duty to submit the question to the consideration of a second jury"); *Flannery* v. *Baltimore & Ohio R. Co.*, 15 D. C. 111, 125 (1885) (When the punitive damages award is disproportionate, "we feel it our duty to interfere").

Judicial intervention in cases of excessive awards also has the critical function of ensuring that another ancient and fundamental principle of justice is observed—that the punishment be proportionate to the offense. As we have observed, the requirement of proportionality is "deeply rooted and frequently repeated in common-law jurisprudence." *Solem* v. *Helm*, 463 U. S. 277, 284–285 (1983). See, *e. g., Le Gras* v. *Bailiff of Bishop of Winchester*, Y. B. Mich. 10 Edw. II, pl. 4 (C. P. 1316), reprinted in 52 Selden Society 3, 5 (1934) (amercement vacated and bailiff ordered to "take a moderate amercement proper to the magnitude and manner of that offence"); First Statute of Westminster, 3 Edw. I, ch. 6 (1275). Because punitive damages are designed as punishment rather than compensation, *Browning-Ferris*, 492 U. S., at 297 (O'CONNOR, J., concurring in part and dissenting in part) (citing cases), courts historically have required that punitive damages awards bear a reasonable relationship to the actual harm imposed.[3] This Court similarly has recognized that

---

[3] *Ante*, at 459, and n. 25 (plurality opinion) ("[S]tate courts have long held that 'exemplary damages allowed should bear some proportion to the real damage sustained,'" quoting *Grant* v. *McDonogh*, 7 La. Ann. 447, 448 (1852), and citing other cases). See, *e. g., McCarthy* v. *Niskern*, 22 Minn. 90, 91–92 (1875) (Punitive damages "enormously in excess of what may

the requirement of proportionality is implicit in the notion of due process. We therefore have held that an award that is "plainly arbitrary and oppressive," *Southwestern Telegraph & Telephone Co.* v. *Danaher*, 238 U. S. 482, 491 (1915), "grossly excessive," *Waters-Pierce Oil Co.* v. *Texas (No. 1)*, 212 U. S. 86, 111 (1909), or "so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable," *St. Louis, I. M. & S. R. Co.* v. *Williams*, 251 U. S. 63, 66–67 (1919), offends the Due Process Clause and may not stand.

## II

The plurality does not retreat today from our prior statements regarding excessive punitive damages awards. Nor does it deny that our prior decisions have a strong basis in historical practice and the common law. On the contrary, it reaffirms our precedents once again, properly rebuffing respondents' attempt to denigrate them as *Lochner*-era aberra-

---

justly be regarded as compensation" for the harm incurred must be set aside "to prevent injustice"); *International & Great Northern R. Co.* v. *Telephone & Telegraph Co.*, 69 Tex. 277, 282, 5 S. W. 517, 518 (1887) (Punitive damages "when allowed should be in proportion to the actual damages sustained" (internal quotation marks omitted)); *Burkett* v. *Lanata*, 15 La. 337, 339 (1860) (Punitive damages should "be commensurate to the nature of the offence"); *Saunders* v. *Mullen*, 66 Iowa 728, 729, 24 N. W. 529 (1885) ("When the actual damages are so small, the amount allowed as exemplary damages should not be so large"); *Flannery* v. *Baltimore & Ohio R. Co.*, 15 D. C. 111, 125 (1885) (When punitive damages award "is out of all proportion to the injuries received, we feel it our duty to interfere"). See also *Leith* v. *Pope, supra*, at 1328, 96 Eng. Rep., at 778 (Court will interfere where damages are "outrageously disproportionate, either to the wrong received, or to the situation and circumstances of either the plaintiff or defendant"); *Duberly* v. *Gunning*, 4 Durn. & E., at 657 (Buller, J.) (The Court has the power to order a new trial where "the damages given are enormously disproportionate to the case proved in evidence"); *Townsend* v. *Hughes*, 2 Mod. *150, *151, 86 Eng. Rep. 994, 995 (C. P. 1677) (Atkins, J.) (court should "consider whether the [offense] and damages bear any proportion; if not, then the Court ought to lay their hands upon the verdict").

tions. *Ante,* at 455. It is thus common ground that an award may be so excessive as to violate due process. *Ibid.* We part company, however, on how to determine if this is such an award.

In Solomonic fashion, the plurality rejects both petitioner's and respondents' proffered approaches, instead selecting a seemingly moderate course. See *ante,* at 456–458. But the course the plurality chooses is, in fact, no course at all. The plurality opinion erects not a single guidepost to help other courts find their way through this area. Rather, quoting *Haslip*'s observation that there is no "'mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable,'" *ante,* at 458 (quoting 499 U. S., at 18), the plurality abandons all pretense of providing instruction and moves directly into the specifics of this case.

I believe that the plurality errs not only in its result but also in its approach. Our inability to discern a mathematical formula does not liberate us altogether from our duty to provide guidance to courts that, unlike this one, must address jury verdicts such as this on a regular basis. On the contrary, the difficulty of the matter imposes upon us a correspondingly greater obligation to provide the most coherent explanation we can. I agree with the plurality that we ought not adopt TXO's or respondents' suggested approach as a rigid formula for determining the constitutionality of punitive damages verdicts. But it does not follow that, in the course of deciding this case, we should avoid offering even a clue as to our own.

TXO's suggestion that this Court should rely on objective criteria has much to commend it. As an initial matter, constitutional judgments "'should not be, or appear to be, merely the subjective views of individual Justices.'" *Rummel* v. *Estelle,* 445 U. S. 263, 274 (1980) (quoting *Coker* v. *Georgia,* 433 U. S. 584, 592 (1977) (opinion of WHITE, J.)). Without objective criteria on which to rely, almost any decision regarding proportionality will be a matter of personal

preference. One judge's excess very well may be another's moderation. To avoid that element of subjectivity, our "'judgment[s] should be informed by objective factors to the maximum possible extent.'" 445 U. S., at 274–275 (quoting same). As the plurality points out, *ante*, at 455–456, TXO directs our attention to various objective indicators, including the relationship between the punitive damages award and compensatory damages, awards of punitive damages upheld against other defendants in the same jurisdiction, awards upheld for similar torts in other jurisdictions, and legislatively designated penalties for similar misconduct. While these factors by no means exhaust the due process inquiry, they are quite probative. It is to their proper application that I now turn.

A

In my view, due process at least requires judges to engage in searching review where the verdict discloses such great disproportions as to suggest the possibility of bias, caprice, or passion. As JUSTICE STEVENS observed in a different context, "[o]ne need not use Justice Stewart's classic definition of obscenity—'I know it when I see it'—as an ultimate standard for judging" the constitutionality of a punitive damages verdict "to recognize that the dramatically irregular" size and nature of an award "may have sufficient probative force to call for an explanation." Cf. *Karcher* v. *Daggett*, 462 U. S. 725, 755 (1983) (concurring opinion) (footnotes omitted).

This $10 million punitive award, returned in a case involving only $19,000 in compensatory damages, is a dramatically irregular, if not shocking, verdict by any measure. At the very least it should raise a suspicious judicial eyebrow. Not only does the punitive award represent over 500 times actual damages, but it also exceeds economic harm by over $9.98 million. Thus, it cannot be accepted as bearing the "understandable relationship to compensatory damages," 499 U. S., at 22, the Court found sufficient in *Haslip*. Indeed, in *Has-*

*lip* the Court observed that an $840,000 punitive award, representing four times compensatory damages, may have been "close to the line" of "constitutional impropriety." *Id.*, at 23–24. If the quadruple damages, $840,000 award in *Haslip* was "close to the line," absent a convincing explanation, this $10 million award—over 500 times actual damages—surely must cross it.

A comparison of this award and prior ones in West Virginia confirms its unusual nature: It is 20 times larger than the highest punitive damages award *ever* upheld in West Virginia history for any misconduct. See App. to Brief for Petitioner 1a–3a (listing punitive damages awards affirmed on appeal in West Virginia). That figure is particularly surprising if one considers the nature of the offense at issue. This is not a case involving grave physical injury imposed on a helpless citizen by a callous malefactor. Rather, it is a business dispute between two companies in the oil and gas industry. TXO was accused of slandering respondents' title to a tract of land—that is, impugning their claim of ownership—in an attempt to win concessions on a pre-existing contract. Although TXO's conduct was clearly wrongful, calculated, and improper, the award in this case cannot be upheld as a reasoned retributive response. Not only is it greatly in excess of the actual harm caused, but it is 10 times greater than the largest punitive damages award for the same tort in any jurisdiction, *id.*, at 5a–8a (listing all recorded punitive damages awards for slander of title affirmed on appeal), and orders of magnitude larger than authorized civil and criminal penalties for similar offenses, see Brief for Petitioner 19, nn. 17–18, and App. to Brief for Petitioner 9a–21a (collecting statutes). By any "objective criteria," *Haslip*, 499 U. S., at 23, the award is "grossly out of proportion to the severity of the offense" and bears no "understandable relationship to compensatory damages," *id.*, at 22. It is, at first blush, an "extreme resul[t] that jar[s] one's constitutional sensibilities." *Id.*, at 18.

That these disproportions might implicate due process concerns the plurality does not deny.   Nonetheless, it refuses to "enshrine petitioner's comparative approach in a 'test' for assessing the constitutionality of punitive damages awards." *Ante*, at 458.   I agree with the plurality that, although it might be convenient to establish a multipart test and impose it upon the States, the principles of federalism counsel against such a course.   The States should be permitted to "experiment with different methods" of ferreting out impermissible awards "and to adjust these methods over time." *Haslip, supra*, at 64 (O'CONNOR, J., dissenting).   Nonetheless, I see no reason why this Court or any other would wish to disregard such probative evidence.   For example, although retribution is a permissible consideration in assessing punitive damages awards, it is quite difficult to determine whether a particular award can be attributed to that goal; retribution resists quantification.   Nonetheless, jury awards in similar cases and the civil and criminal penalties created by the legislature for like conduct can give us some idea of the limits on retribution.   Thus, a $5,000 punitive damages award on actual damages of $1 may not seem well proportioned at first blush; but if the legislature has seen fit to impose a $50,000 penalty for that very same conduct, the award might be deemed a reasoned retributive response.

This approach, of course, has its limits.   Because no two cases are alike, not all comparisons will be enlightening. See *ante*, at 457–458 (plurality opinion).   But recognizing the limits of an approach does not compel us to discard it entirely. I do not see what can be gained by blinding ourselves to the few clear guideposts in an area so painfully bereft of objective criteria.   Indeed, JUSTICE STEVENS joined in proposing precisely such an approach to punitive damages under the Eighth Amendment in *Browning-Ferris*, see 492 U. S., at 301 (O'CONNOR, J., joined by STEVENS, J., concurring in part and dissenting in part).   Moreover, courts at common law engaged in similar comparisons.   See, *e. g., Travis* v. *Barger,*

24 Barb. 614, 629 (N. Y. 1857) (comparing verdicts for similar torts); *International & Great Northern R. Co.* v. *Telephone & Telegraph Co.,* 69 Tex. 277, 282, 5 S. W. 517, 518 (1887) (comparing ratios). In any event, what the comparisons demonstrate in this case is what one might have suspected from the beginning. This award cannot be justified as a reasoned retributive response, for it is notably out of line with the punishment previously imposed by juries or established by statute for similar conduct.

### B

That, however, does not end our inquiry. In some cases, the unusual nature of the award will be explained by the peculiar considerations placed before the jury. Indeed, the plurality asserts that such an explanation exists in this case. The award, the plurality explains, may have been based on the profit TXO anticipated or the harm TXO would have imposed on respondents had its scheme been successful. *Ante,* at 459–462.

I have no quarrel with the plurality that, in the abstract, punitive damages may be predicated on the potential but unrealized harm to the victim, or even on the defendant's anticipated gain. Linking the punitive award to those factors not only substantially furthers the State's weighty interests in deterrence and retribution, but also can be traced well back in the common law. See, *e. g., Benson* v. *Frederick,* 3 Burr. 1846, 97 Eng. Rep. 1130 (K. B. 1766) (Wilmot, J.) (damages for ordering the plaintiff flogged by two drummers not excessive even though disproportionate to plaintiff's actual suffering, as "it was rather owing to the lenity of the drummers than of the [defendant] that the [plaintiff] did not suffer *more*"). The plurality's theory, however, bears little relationship to what actually happened in this case.

### 1

The record demonstrates that the potential harm theory is little more than an after-the-fact rationalization invented by

counsel to defend this startling award on appeal. The $5 to $8.3 million estimate of potential loss that respondents proffer today appears nowhere in the record. No expert or lay witness testified to the jury about any such figure. No one directed the jury's attention to the technical documents or scattered testimony on which respondents now rely. See *ante*, at 450–451, n. 10 (plurality opinion). No one told the jury how to pull all those numbers together to calculate such a figure. In fact, the jury never was told that it was permitted to do so.

Respondents did not even present their $5 to $8.3 million estimate to defend the verdict before the West Virginia Supreme Court of Appeals. Nor did that court rely on such an estimate. Its opinion, which the plurality applauds as "thorough," *ante*, at 465, nowhere suggests that the jury might have based the award on the potential harm to respondents or on TXO's anticipated profit. Rather, its sole reference to potential harm is the "millions of dollars of damages" that might result if TXO *repeated* its misdeeds against "*other victims.*" 187 W. Va., at 476, 419 S. E. 2d, at 889 (emphasis added). Virtually any tort, however, can cause millions of dollars of harm if imposed against a sufficient number of victims.

Respondents' $5 to $8.3 million estimate appeared for the first time after this Court granted certiorari, having been produced exclusively for our consumption. As the plurality notes, there is every reason to believe that the figure, derived as it is from a series of extrapolations and economic assumptions never presented to the jury and yet untested by adversary presentation, is unrealistic. See *ante*, at 461. Consequently, the plurality refuses to rely on the figure, instead offering a series of its own estimates. See *ante*, at 462. These estimates also are speculative, however, as the plurality does not indicate how they were derived or where they are supported in the record. The little evidence regarding potential harm the record does yield, it turns out, is

so uncertain and ambiguous that the plurality cannot rely on it, either; to the extent it demonstrates anything at all, it shows respondents' estimate to be exaggerated. See Tr. 100, 103–104.

2

But even if we assume that the plurality's estimates of potential harm are plausible or supported by the evidence, they are, on this record, entirely irrelevant. The question is not simply whether *this Court* might think the award appropriate in light of its estimate of potential harm. The question is also whether *the jury* might have relied on such an estimate rather than some impermissible factor, such as a personal preference for the primarily local plaintiffs as compared to the unsympathetic and wealthy out-of-state defendant, as TXO contends. After all, due process does not simply require that a particular result be substantively acceptable; it also requires that it be reached on the basis of permissible considerations. See *Haslip*, 499 U. S., at 41 (KENNEDY, J., concurring in judgment). In this case, the jury instructions precluded the jury from relying on the potential harm theory the plurality endorses. As a result, that theory can neither explain nor justify the otherwise astonishing verdict the jury returned.

At trial, the jury was instructed to consider numerous factors when setting the punitive damages award, including "'the nature of the wrongdoing, the extent of the harm inflicted, the intent of the party committing the act, the wealth of the perpetrator, as well as any mitigating circumstances.'" *Ante*, at 463, n. 29 (plurality opinion) (quoting App. 34–35). Nowhere do the instructions mention the alternative measure of potential harm to respondents upon which the plurality relies today.

Of course, the instructions do mention that the goal of punitive damages is deterrence. One therefore might hypothesize that a particularly sophisticated jury would realize that imposing damages in an amount linked to potential harm or

the defendant's expected gain might provide appropriate deterrence. One might even go so far as to suppose that the jury would be daring enough to apply that measure, even though the trial court listed numerous factors, including *actual* harm, but made no mention of *potential* harm. But such speculation has no application in this case, for the jury instructions made it quite clear that deterrence was linked not to an unmentioned factor like potential gain but to a factor the trial court *did* mention—TXO's wealth:

> "'The object of [punitive damages] is to deter TXO Production Corp. and others from committing like offenses in the future. *Therefore* the law recognizes that to in fact deter such conduct may require a larger fine upon one of large means than it would upon one of ordinary means under the same or similar circumstances.'" *Ante*, at 463, n. 29 (plurality opinion) (quoting App. 35) (emphasis added).

A reasonable juror hearing these instructions would not have felt free to consider the potential harm or expected gain measures the plurality proposes today.

The two passages the plurality excerpts from closing arguments, see *ante*, at 461, do not support the plurality's theory. Respondent Tug Fork Land Company's closing argument does mention that TXO thought the wells would produce "'lot[s] of money.'" *Ibid.* (quoting Tr. 748–749). But that remark had nothing to do with punitive damages. Instead, counsel was addressing the issue of liability: According to him, TXO's desire to obtain all the royalties was the motive for its bad faith conduct. See Tr. 746–749 (TXO slandered respondents' title to lower the value of the property so it could exact concessions or win 100% of royalties by means of a lawsuit). When counsel *did* discuss the appropriate measure of punitive damages, not once did he mention the potential harm to respondents. Instead, he relied exclusively on TXO's vast wealth:

> "His Honor has instructed you that you may award punitive damages and I've indicated to you what punitive damages [are]. *Now, just consider the wealth of this corporation.* [T]he reason for putting in [expert evidence on TXO's resources] is *that's how a jury considers the amount of punitive damages.* This is a multi-million dollar corporation—even a billion dollars in assets. . . . [Think about imposing a punitive award in the range of a] million, twelve million dollars. Those kinds of numbers are not out of line when you talk about a corporation that has assets of something like a billion dollars." *Id.,* at 757–758 (emphases added).

Counsel for respondent Alliance Resources Corp. similarly did not argue that punitive damages should be linked to potential harm. He did mention that TXO anticipated a large profit from its nefarious scheme. See *id.,* at 779–780; *ante,* at 461 (plurality opinion). But counsel once again made no attempt to quantify TXO's potential gain. Nor did he encourage the jury to base the punitive damages award on TXO's expected profit. Instead, counsel argued only *one* measure for punitive damages—TXO's wealth:

> "A two billion dollar company. Ha[s] earnings of $225,000,000, average. Last year made $125,000,000.00 alone. Last year. Now, what's a good fine for a company like that? A hundred thousand? A million? You can do that if you think it's fair . . . ." Tr. 781.

The portion of counsel's argument the plurality relies upon, *ante,* at 461, turns out to be a transition between a discussion of TXO's conduct and a plea for the jury to award punitive damages based exclusively on TXO's wealth. Immediately after delivering the portion of the argument the plurality reproduces—in which counsel told the jury that the punishment should " 'fit' " the scheme and " 'fit the wealth,' " *ibid.*— he asked rhetorically, "Now, how much is the wealth?" Tr. 780. It was then that he told the jury, in great detail, about

TXO's vast resources. At no point, however, did counsel ask rhetorically, "Now, how much was the potential profit?" At no point did he answer that question. Nor did he ever suggest that the jury calculate potential harm or base its punitive damages award thereon. Instead, like cocounsel before him, he relied exclusively on TXO's wealth. See *id.*, at 781–782.

I am therefore unpersuaded by the plurality's assertion that this award may be upheld based on the potential harm to respondents or TXO's potential gain. That theory was not available to the jury under the court's instructions. It was not one supported by evidence on which the jury might have relied. And it is not one that trial counsel chose to promote. It was instead an after-the-fact rationalization invented by appellate counsel who could not otherwise explain this disproportionate award.

## C

There is another explanation for the verdict, but it is not one that permits affirmance. As I read the record in this case, it seems quite likely that the jury in fact was unduly influenced by the fact that TXO is a very large, out-of-state corporation.

In *Haslip*, this Court considered jury instructions that differed from those used here in two material respects. First, unlike the instructions in *Haslip*, which did not permit the jury to consider the defendant's wealth, the instructions in this case specifically directed the jury to take TXO's wealth into account. The plurality concedes that introducing TXO's wealth into the calculus "increased the risk that the award may have been influenced by prejudice against large corporations, a risk that is of special concern when the defendant is," as here, "a nonresident." *Ante*, at 464. Second, the instructions directed the jury to impose punitive damages "'to provide additional compensation for the conduct to which the injured parties have been subjected.'" *Ante*, at 463, n. 29

(plurality opinion) (quoting App. 34). The latter instruction, of course, is without legal meaning. *Ante,* at 464 (plurality opinion) (We do "not understand the reference . . . to 'additional compensation'"). Plaintiffs are compensated for injuries they have suffered; one cannot speak of "additional compensation" unless it is linked to some additional harm.

To a juror, however, compensation is the money it awards the plaintiff; "additional compensation," if not linked to a particular measure of harm, is simply additional money the jury gives to the plaintiff. As a result, the "additional compensation" instruction, considered together with the instruction directing the jury's attention to TXO's massive wealth, encouraged the jury to transfer some of TXO's impressive wealth to the smaller and more sympathetic respondents as undifferentiated "additional compensation"—for any reason, or no reason at all. In fact, the instructions practically ensured that this would occur. They provided the jury with only two objective factors on which to rely. See *supra,* at 486 (citing jury instructions). The first was actual harm, a relatively small sum on which the jury obviously did not rely; the second was TXO's wealth, a factor that obviously impressed the jury a great deal. Thus, unlike the instructions in *Haslip,* these instructions did not prevent respondents from "enjoy[ing] a windfall because they have the good fortune to have a defendant with a deep pocket." 499 U. S., at 22. Instead, they ensured that a windfall verdict would result by inviting the jury to redistribute wealth to respondents as undifferentiated "additional compensation," based solely on TXO's financial position.

That a jury might have such inclinations should come as no surprise. Courts long have recognized that jurors may view large corporations with great disfavor. See, *e. g., Illinois Central R. Co.* v. *Welch,* 52 Ill. 183, 188 (1869) ("[J]uries may generally assess an amount of damages against railway corporations which, in similar cases between individuals, would be considered unjust in the extreme. It

is lamentable that the popular prejudice against these corporations should be so powerful as to taint the administration of justice, but we cannot close our eyes to the fact"). Corporations are mere abstractions and, as such, are unlikely to be viewed with much sympathy. Moreover, they often represent a large accumulation of productive resources; jurors naturally think little of taking an otherwise large sum of money out of what appears to be an enormously larger pool of wealth. Finally, juries may feel privileged to correct perceived social ills stemming from unequal wealth distribution by transferring money from "wealthy" corporations to comparatively needier plaintiffs. Brickman, The Asbestos Litigation Crisis, 13 Cardozo L. Rev. 1819, 1849, n. 128 (1992); Ellis, Fairness and Efficiency in the Law of Punitive Damages, 56 S. Cal. L. Rev. 1, 61–62 (1982); Owen, Problems in Assessing Punitive Damages Against Manufacturers of Defective Products, 49 U. Chi. L. Rev. 1, 45–46 (1982) (jury assessing punitive damages against multimillion dollar corporation forced to think of an award measuring seven, eight, or nine figures); see also *supra*, at 474–475 (juror discretion in awarding punitive damages not limited); cf. *Smith* v. *Covell*, 100 Cal. App. 3d 947, 960, 161 Cal. Rptr. 377, 385 (1980) (juror impressed with idea that plaintiffs had money and " 'didn't need anymore' ").

This is not to say that consideration of a defendant's wealth is unconstitutional. To be sure, there are strong economic arguments that permitting juries to consider wealth is unwise if not irrational, see Abraham & Jeffries, Punitive Damages and the Rule of Law: The Role of Defendant's Wealth, 18 J. Legal Studies 415 (1989), especially where the defendant is a corporation, *id.*, at 421–422; cf. *Zazú Designs* v. *L'Oréal, S. A.*, 979 F. 2d 499, 508–509 (CA7 1992) (Easterbrook, J.). But, "[j]ust as the Fourteenth Amendment does not enact Herbert Spencer's Social Statics, see *Lochner* v. *New York*, 198 U. S. 45, 75 (1905) (Holmes, J., dissenting)," it does not require us to adopt the views of the Law and

Economics school either. As a historical matter, the wealth of the perpetrator long has been thought relevant. See *Browning-Ferris*, 492 U. S., at 300 (O'CONNOR, J., concurring in part and dissenting in part) (citing the Magna Carta and Blackstone's Commentaries). Moreover, *Haslip* itself suggests that the defendant's wealth is a permissible consideration, *ante*, at 462, n. 28, 464 (plurality opinion), although it does so only in the context of *appellate* review. See 499 U. S., at 22.

Nonetheless, courts must have authority to recognize the special danger of bias that such considerations create. The plurality does just that today, *ante*, at 464, as this Court, other tribunals, and numerous commentators have before. See, *e. g.*, Morris, Punitive Damages in Tort Cases, 44 Harv. L. Rev. 1173, 1191 (1931) ("It is a good guess that rich men do not fare well before juries, and the more emphasis placed on their riches, the less well they fare. Such evidence may do more harm than good; jurymen may be more interested in divesting vested interests than in attempting to fix penalties which will make for effective working of the admonitory function"); Abraham & Jeffries, *supra*, at 424; *Illinois Central R. Co.*, *supra*, at 188 (bias against railroads); *McConnell v. Hampton*, 12 Johns. 234, 236 (N. Y. 1815) (Thompson, C. J.) (jury unduly influenced by defendant's great wealth); cf. *Newport v. Fact Concerts, Inc.*, 453 U. S. 247, 270–271 (1981) ("[E]vidence of a [municipality's wealth, inasmuch as it has unlimited taxing power], may have a prejudicial impact on the jury, in effect encouraging it to impose a sizable award. The impact of such a windfall recovery is likely to be both unpredictable and, at times, substantial"); see also *Haslip*, 499 U. S., at 43 (O'CONNOR, J., dissenting) (jurors, if not properly guided, may "target unpopular defendants . . . and redistribute wealth").

The risk of prejudice was especially grave here. The jury repeatedly was told of TXO's extraordinary resources, which respondents estimated at $2 billion. To make matters

worse, unlike the jurors or the primary plaintiffs, TXO was not from West Virginia. It was an interloper, from the large State of Texas. As the Supreme Court of Appeals of West Virginia has recognized, the temptation to transfer wealth from out-of-state corporate defendants to in-state plaintiffs can be quite strong. See *Garnes* v. *Fleming Landfill, Inc.*, 186 W. Va. 656, 665, 413 S. E. 2d 897, 906 (1991) (Excess jury discretion "[i]nevitably . . . leads to increasing efforts to redistribute wealth from without the state to within"; cases involving large awards typically pit local plaintiffs against "out-of-state (often faceless, publicly held) corporations"). That court speaks from experience. The three highest punitive damages awards ever affirmed in West Virginia, including this one, were assessed against relatively wealthy out-of-state defendants. *Jarvis* v. *Modern Woodmen of America*, 185 W. Va. 305, 406 S. E. 2d 736 (1991); *Berry* v. *Nationwide Mutual Fire Ins. Co.*, 181 W. Va. 168, 381 S. E. 2d 367 (1989).

Counsels' arguments, however, converted that grave risk of prejudice into a near certainty. Repeatedly they reminded the jury that TXO was from another State. Repeatedly they told the jury about TXO's massive wealth. And repeatedly they told the jury that it could do anything it thought "fair." The opening line from rebuttal set the tone. "Ladies and gentleman of the jury," one attorney began, "this greedy bunch from down in Texas still doesn't understand this case." Tr. 773. Playing on images of Texans as overrich gamblers who profit by chance rather than work, he referred to TXO shortly thereafter as a bunch of "Texas high rollers, wildcatters." *Id.*, at 777. Finally, counsel drove the point home yet one more time, comparing TXO to an obviously wealthy out-of-town visitor who refuses to put money in the parking meter to help pay for community service:

"Well, what is fair? . . . If someone *comes to town* and intentionally doesn't put a quarter in the meter, stays

here all day, [in this] *town that needs it to pay for the police force and the fire department,* they give [him] a fine. And at the end of the day [he] may have to pay a dollar. That person reaches in his billfold at the end of the day and maybe *he's got a hundred bucks in there.* He doesn't want to have to pay that dollar, but he does, because he knows if he doesn't [he'll have legal problems]. . . . The town didn't take everything from the individual, didn't ruin [him], just took one percent of what that person had in cash. One percent. *You can fine TXO one percent if you want, you can fine them one dollar if you want.* But I submit to you a one percent fine, the same as John Doe on this street, would be fair. *That's twelve and a half million dollars, based on what they had left over. And their earnings w[ere] $225,000,000.00 [per year].* I mean, yeah, their cash flow. Their surplus. So anything between twelve and a half million and twenty-two million is only one percent—the same as this poor guy who just tried to cheat a little bit. Now that's a lot of money. I hope, like I said, you *don't analyze this on a lot or a little, but fair." Id.,* at 781–782 (emphases added).

Over and over respondents' lawyers reminded the jury that there were virtually no substantive limits on its discretion. Time and again they told the jury of TXO's great wealth and that it could take away any amount it wanted, as long as it seemed "fair." *Id.,* at 781 ("It isn't really whether the verdict is too large or too small, too big or too little. It's whether it's fair"); *ibid.* ("A two billion dollar company. Have earnings of $225,000,000.00, average. Last year made $125,000,000.00 alone. Last year. Now, what's a good fine for a company like that? A hundred thousand? A million? You can do that if you think it's fair . . ."). And each time the argument found solid support in the trial court's instructions, which not only licensed the jury to afford respondents

any "additional compensation" they believed appropriate, but also encouraged them to do so based on TXO's wealth alone.

Given the absence of another plausible explanation for this monumentally large punitive damages award, I believe it likely, if not inescapable, that the jury was influenced unduly by TXO's out-of-state status and its large resources. The plurality acknowledges this possibility, see *ante*, at 464, but refuses to address it. TXO, the plurality contends, failed to press its objections to the jury instructions in the state court below. *Ibid.* I disagree. TXO's brief specifically argued that the jury instructions did not meet the "*Haslip* standards and [were] not constitutionally permissible." Brief for Appellant in No. 20281 (W. Va.), p. 48; see *id.*, at 44–46 (jury instructions insufficient under *Garnes* v. *Fleming Landfill, Inc.*, *supra*, a recent West Virginia Supreme Court of Appeals decision interpreting *Haslip*). The State Supreme Court of Appeals so understood TXO's challenge. See 187 W. Va., at 473–477, 419 S. E. 2d, at 886–890.

Of course, TXO did not make precisely the same arguments it makes here. But it was not required to. "Once a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below." *Yee* v. *Escondido*, 503 U. S. 519, 534 (1992). There can be little doubt that TXO argued below that the punitive damages award was excessive; there can be little doubt that TXO identified the jury instructions as being partially responsible. TXO ought not be precluded from fully presenting its arguments here. Because those arguments demonstrate that this award was based on considerations inconsistent with due process, I would reverse the judgment below so the matter could be submitted to the consideration of a second jury.

### III

Confronted by a $10 million verdict on damages of $19,000, the State Supreme Court of Appeals in this case did not en-

gage in searching review. Instead it added insult to injury, applying cavalier standards in the course of a cursory examination of the case. Because the review afforded TXO was insufficient to conform with the criteria this Court approved in *Haslip*, the case at least should be remanded for constitutionally adequate postverdict review.

## A

Two Terms ago, this Court in *Haslip* upheld Alabama's punitive damages regime against constitutional challenge. Although the Court recognized that juries in Alabama receive limited instructions regarding punitive damages, see 499 U. S., at 6, n. 1, 19–20, it was reassured by the fact that the Alabama courts subject punitive verdicts to exacting postverdict review at two different levels. First, Alabama trial courts must indicate on the record their " 'reasons for interfering with a jury verdict, or refusing to do so, on grounds of excessiveness.' " *Id.*, at 20 (quoting *Hammond v. Gadsden*, 493 So. 2d 1374, 1379 (1986)). Second, the Alabama Supreme Court itself provides an additional "check" by conducting comparative analysis and applying detailed substantive standards—seven in all—thereby "ensur[ing] that the award does not exceed an amount that will accomplish society's goals of punishment and deterrence." 499 U. S., at 21 (internal quotation marks omitted). Specifically, the Alabama Supreme Court examines:

> "(a) whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred; (b) the degree of reprehensibility of the defendant's conduct, the duration of that conduct, the defendant's awareness, any concealment, and the existence and frequency of similar past conduct; (c) the profitability to the defendant of the wrongful conduct and the desirability of removing that profit and of having the defendant also sustain a loss; (d) the 'financial

position' of the defendant; (e) all the costs of litigation; (f) the imposition of criminal sanctions on the defendant for its conduct, these to be taken in mitigation; and (g) the existence of other civil awards against the defendant for the same conduct, these also to be taken in mitigation." *Id.*, at 21–22.

In *Haslip*, the Court concluded that application of those standards "imposes a sufficiently definite and meaningful constraint" on factfinder discretion. *Id.*, at 22. Because the standards had a "real effect," *ibid.*, the Court upheld Alabama's regime against constitutional challenge despite the relatively sparse guidance it afforded juries.

As the plurality admits, *ante*, at 463–464, the jury instructions used here were not dissimilar to those employed in *Haslip*. Unlike *Haslip*, however, the verdict they produced was not subjected to post-trial review sufficient to impose a "meaningful constraint" on factfinder discretion. Indeed, the post-trial review offered here bears no resemblance to that approved in *Haslip*. In contrast to the trial judge in *Haslip*, the trial judge here made no written findings. Nor did he announce why he believed—or even if he believed—that the amount of damages bore a reasonable or recognizable relationship to actual damages or any other relevant measure. Instead, ruling from the bench, the trial judge summarily denied TXO's motions seeking reduction or elimination of the punitive damages award.

More important, the Supreme Court of Appeals of West Virginia did not do much better. At the outset, it refused to consider the possibility of remittitur because TXO "and its agents and servants failed to conduct themselves as gentlemen." 187 W. Va., at 462, 419 S. E. 2d, at 875. Proceeding to the question whether the award of punitive damages should be stricken as excessive, the court distinguished between two categories of defendants: those who are "really stupid" and those who are "really mean." *Id.*, at 474–476, 419 S. E. 2d, at 887–889. If the defendant is "really stupid,"

the court explained, "the outer limit of punitive damages is" generally about "five to one." *Id.*, at 476, 419 S. E. 2d, at 889. For the "really mean" defendant, however, "even punitive damages 500 times greater than compensatory damages are not *per se* unconstitutional." *Ibid.* TXO, it seems, was not really stupid but "really mean." The Supreme Court of Appeals affirmed the $10 million punitive award even though it was 526 times greater than compensatory damages.

Reference to categories like "really stupid" and "really mean" are a caricature of the difficult task of determining whether an award may be upheld consistent with due process. It is simply not enough to observe that the conduct was malicious and conclude that, as a result, the sky (or 500 times compensatory damages) is the limit. But cf. *ante*, at 468–469 (KENNEDY, J., concurring in part and concurring in judgment) (so concluding solely because the conduct was malicious and the defendant rich). Instead, post-trial review must be sufficient to "ensur[e] that punitive damages awards are not grossly out of proportion to the severity of the offense and have some understandable relationship to" some measure of harm. *Haslip, supra,* at 22. Aside from its two-page dissertation on the difference between "really stupid" and "really mean," however, the State Supreme Court of Appeals offered only three conclusory sentences in a single paragraph to bolster its conclusion that the damages here were not excessive. See *ante*, at 453 (plurality opinion) (citing 187 W. Va., at 476, 419 S. E. 2d, at 889). Because I believe that such cursory review is inconsistent with this Court's decision in *Haslip*, I cannot join my colleagues in affirming.

B

That the Supreme Court of Appeals would engage in such cursory review is something of a surprise. In *Garnes* v. *Fleming Landfill, Inc.*, 186 W. Va. 656, 413 S. E. 2d 897 (1991), that court demonstrated concern for the due process implications of punitive awards. Holding that West Virgin-

ia's previous punitive damages regime was constitutionally suspect in light of *Haslip*, it required trial courts to instruct juries on numerous factors relevant to the measure of punitive damages, see 186 W. Va., at 667–668, 413 S. E. 2d, at 908–909; it mandated that trial courts conduct extensive review and articulate reasons for their decisions on the record, *id.*, at 668–669, 413 S. E. 2d, at 909–910; and it announced that it would apply the factors approved in *Haslip* in its own review, 186 W. Va., at 669, 413 S. E. 2d, at 910.

Unfortunately for TXO, *Garnes* was decided after TXO's trial took place. Although the Supreme Court of Appeals recognized that TXO had not received the benefit of *Garnes'* and *Haslip's* protections, it refused to remand the case. Instead, the court indicated that it would be "especially diligent" in reviewing this award; it went on to recite language from both *Haslip* and *Garnes*. It is therefore clear that *Haslip* still governs punitive damages awards in West Virginia. As a result, the plurality perhaps declines to reverse because it believes that the Supreme Court of Appeals' failure to follow *Haslip* here is of little consequence to anyone but TXO. After all, a decision of this Court requiring more searching review would alter only the result in this particular case and perhaps a few like it, without changing the law, even in West Virginia.

If the plurality is in fact proceeding on such an assumption, I believe it is mistaken. While this Court has the ultimate power to interpret the Constitution, we grant review in only a small number of cases. We therefore rely primarily on state courts to fulfill the constitutional role as primary guarantors of federal rights. But the state courts must do more than recite the constitutional rule. They also must apply it, faithful to its letter and cognizant of the principles underlying it. Unfortunately, such review is not always forthcoming. *Amici* recite case after case in which review has been inadequate or absent altogether. See, *e. g.*, Brief for Phillips Petroleum Co. et al. as *Amici Curiae* 20–27. The Supreme

Court of Appeals of West Virginia, at the same time it recognized *Haslip* as law, itself warned:

> "[W]e understand as well as the next court how to . . . articulate the correct legal principle, and then perversely fit into that principle a set of facts to which the principle obviously does not apply. [All judges] know how to mouth the correct legal rules with ironic solemnity while avoiding those rules' logical consequences." *Garnes, supra,* at 666, 413 S. E. 2d, at 907 (footnote omitted).

I fear that the Supreme Court of Appeals followed such a course in this case. By affirming the judgment nonetheless, today's decision renders the meaningful appellate review contemplated in *Haslip* illusory; courts now may disregard the post-trial review required by due process at whim or will, so long as they do not deny its necessity openly or altogether.

IV

As little as 30 years ago, punitive damages awards were "rarely assessed" and usually "small in amount." Ellis, 56 S. Cal. L. Rev., at 2. Recently, however, the frequency and size of such awards have been skyrocketing. One commentator has observed that "hardly a month goes by without a multimillion-dollar punitive damages verdict in a product liability case." Wheeler, A Proposal for Further Common Law Development of the Use of Punitive Damages in Modern Product Liability Litigation, 40 Ala. L. Rev. 919 (1989). And it appears that the upward trajectory continues unabated. See Volz & Fayz, Punitive Damages and the Due Process Clause: The Search for Constitutional Standards, 69 U. Det. Mercy L. Rev. 459, 462, n. 17 (1992). The increased frequency and size of punitive awards, however, has not been matched by a corresponding expansion of procedural protections or predictability. On the contrary, although some courts have made genuine efforts at reform, many courts

continue to provide jurors with skeletal guidance that permits the traditional guarantor of fairness—the jury itself—to be converted into a source of caprice and bias. This Court's decision in *Haslip* promised that, even if juries occasionally failed to fulfill their function faithfully, trial and appellate courts would provide meaningful review sufficient to discern impermissible influences and guarantee constitutional results. In my view, today's decision fails to make good on that promise. I therefore respectfully dissent.